# IN THE COURT OF APPEALS OF TENNESSEE
## MIDDLE SECTION AT NASHVILLE

**FILED**

**October 1, 1997**

**Cecil W. Crowson**
**Appellate Court Clerk**

BELLSOUTH TELECOMMUNICATIONS, INC.　)
d/b/a SOUTH CENTRAL BELL TELEPHONE
COMPANY,　　　　　　　　　　　　　　)

　　　　)

　　Petitioner/Appellant,　　　　　　　)

　　)

VS.　　　　　　　　　　　　　　　　　)

　　)

H. LYNN GREER, Chairman, SARA KYLE,　)
Director, and MELVIN J. MALONE, Director,　)
Constituting the Tennessee Regulatory Authority,　)

　　)

　　Respondents/Appellees.　　　　　　)

)　　**October 1, 1997**

Public Service
Commission
No. 95-03383

Appeal No.
01A01-9601-BC-00008


BELLSOUTH TELECOMMUNICATIONS, INC.,　)

　　)　　Public Service

　　Petitioner,　　　　　　　　　　　)　　Commission

　　)　　No. 95-02614

VS.　　　　　　　　　　　　　　　　　)

　　)　　Appeal No.

TENNESSEE PUBLIC SERVICE COMMISSION,　)　　01A01-9602-BC-00066

　　)

　　Respondent.　　　　　　　　　　　)


STATE OF TENNESSEE, on relations of　)
BELLSOUTH TELECOMMUNICATIONS, INC.,　)

　　)

　　Petitioner/Appellant,　　　　　　　)　　Davidson Chancery

　　)　　No. 95-2965-II

VS.　　　　　　　　　　　　　　　　　)

　　)

KEITH BISSELL, STEVE HEWLETT, and　)

　　Appeal No.

SARA KYLE, in their capacity as Commissioners　)　　01A01-9601-CH-00016
of the Tennessee Public Service Commission,　)

　　)

　　Respondents/Appellees.　　　　　　)

For BellSouth Telecommunications, Inc.:

Guy M. Hicks, III
Bennett L. Ross
Nashville, Tennessee

James G. Harralson
Atlanta, Georgia


For AT&T Communications of the South Central States, Inc.:

Val Sanford
John Knox Walkup
Gullett, Sanford, Robinson & Martin
Nashville, Tennessee

For Tennessee Public Service Comm.:

Charles W. Burson
Attorney General & Reporter

Michael E. Moore
Solicitor General

Michael W. Catalano
Associate Solicitor General
Nashville, Tennessee


For Tennessee Consumers:

Charles W. Burson
Attorney General & Reporter

Michael E. Moore
Solicitor General

L. Vincent Williams
Consumer Advocate
Nashville, Tennessee

**VACATED AND REMANDED**

WILLIAM C. KOCH, JR., JUDGE

# **O P I N I O N**

This consolidated appeal of three separate proceedings involves the efforts of BellSouth Telecommunications, Inc. to take advantage of the 1995 legislation easing the traditional regulatory burdens on telecommunications service providers. After making significant adjustments in BellSouth's reported operating results, the Tennessee Public Service Commission determined that BellSouth's current earned rate of return exceeded its authorized rate of return and that BellSouth was receiving $56.285 million in excess revenues. The Commission directed BellSouth to reduce its rates by $56.285 million and set the initial rates in the company's price regulation plan accordingly. On this appeal, BellSouth and another intervening party take issue with the procedures employed by the Commission to consider and act upon BellSouth's application for a price regulation plan. We have determined that these proceedings were not preempted by the federal Telecommunications Act of 1996. We have also determined that the General Assembly did not give the Commission authority to adjust BellSouth's reported operating results and that the Commission should have convened a contested case hearing when BellSouth took issue with the Commission's decision to adjust its reported operating results. Accordingly, we vacate the Commission's January 23, 1996 order and all earlier related orders.

## I.

Almost ten years ago, the Tennessee Public Service Commission began its efforts to modernize Tennessee's telecommunications network and to explore less cumbersome ways to regulate the telephone companies under its jurisdiction.[1] The Commission's work culminated in its first regulatory reform rule that took effect on January 10, 1993.[2] One day later, BellSouth Telecommunications, Inc. filed its conditional election to operate under this rule.

On August 20, 1993, the Commission entered an order governing BellSouth's rates from 1993 through 1995. See *In re Earnings Investigation of South Central Bell Telephone Co., 1993-1995,* Docket No. 92-13527. Based on the results of an

---

[1]The details of these early efforts are recounted in *Tennessee Cable Television Assoc. v. Tennessee Pub. Serv. Comm'n,* 844 S.W.2d 151, 155-58 (Tenn. Ct. App. 1992).

[2]Tenn. Comp. R. & Regs. r. 1220-4-2-.55 (1993). This rule was revised again in June 1995.

earnings investigation that had been commenced in 1992, the Commission concluded that a range of return on BellSouth's rate base of 10.65% to 11.85% would be just and reasonable. The Commission adopted BellSouth's recommendation that future rate adjustments and deferred revenue account contributions should be based on the company's actual first-year results, as opposed to projections.[3] It also determined that there would be no rate adjustment for 1993 because BellSouth's forecasted rate of return for 1993 fell within the approved range. This court approved the Commission's order in all respects. *American Assoc. of Retired Persons v. Tennessee Pub. Serv. Comm'n,* 896 S.W.2d 127 (Tenn. Ct. App. 1994).

In December 1994, the Consumer Advocate[4] requested the Commission to resolve what he considered to be inappropriate expense allocations in BellSouth's Form PSC-3.01 reports.[5] When the Commission did not respond, the Consumer Advocate filed a petition on January 23, 1995 requesting the Commission to commence an investigation into BellSouth's earnings. In March 1995, the Commission announced that it was commencing another earnings investigation with regard to BellSouth.

In the meantime, two competing telecommunications bills were introduced in the first session of the Ninety-Ninth General Assembly that had convened in January 1995. The avowed purpose of both bills was to ease the traditional regulatory constraints on local telephone companies and to permit greater competition for local telecommunications services. Filed concurrently with these bills was a bill to replace the Commission with a new regulatory entity. On May 26, 1995, the Governor signed a bill replacing the Commission with the Tennessee Regulatory Authority

---

[3]The Commission specifically declined to follow its staff recommendation favoring forecasts because the company's actual earnings had been below the forecasted earnings. The Commission noted that "[c]ontinuation of a policy similar to that which we started in 1990 could, if forecasts continue to be missed, result in rate decreases for companies that need rate increases, and rate increases for companies that are overearning." *In re Earnings Investigation of South Central Bell Telephone Co.,* 1993-1995, Docket No. 92-13527, at 7.

[4]The Consumer Advocate Division in the Office of the Attorney General and Reporter was created in 1994 for the purpose of representing the interests of Tennessee's consumers before the Commission. Tenn. Code Ann. § 65-4-118(c) (Supp. 1996).

[5]The Form PSC-3.01 report is a monthly report containing a telephone company's intrastate operating results in accordance with rules and forms established by the Commission. *See* Tenn. Comp. R. & Regs. r. 1220-4-1-.10(2)(a)(1), - .10(3)(a) (1988).

effective July 1, 1996.[6]  Two weeks later, the Governor signed another bill dramatically altering the regulation of local telephone companies and opening up the local telecommunications market to unprecedented opportunities for competition.[7]

The expressed goal of the new regulatory structure was

> to foster the development of an efficient, technologically advanced, statewide system of telecommunications services by permitting competition in all telecommunications services markets, and by permitting alternative forms of regulation for telecommunications services and telecommunications services providers.

*See* Tenn. Code Ann. § 65-4-123 (Supp. 1996).  In broad terms, the 1995 legislation set out to accomplish this goal in five ways.  First, it mandated the universal availability of basic telephone service at affordable rates and froze basic and non-basic telephone rates for four years.[8]  Second, it required incumbent local telephone companies to make available non-discriminatory interconnection to their public networks to other providers.[9]  Third, it eased the traditional limitations on the ability of new providers to enter the market.[10]  Fourth, it provided a transition procedure to enable existing local telephone companies to take advantage of the newly relaxed regulatory environment.[11]  Fifth, it established a five-year, $10 million loan guarantee program to induce small and minority businesses to enter the telecommunications market.[12]

---

[6]Act of May 24, 1995, ch. 305, 1995 Tenn. Pub. Acts 450.

[7]Act of May 25, 1995, ch. 408, 1995 Tenn. Pub. Acts 703, codified at Tenn. Code Ann. §§ 65-4-101, -123 & -124, 65-4-201, -203, -207, and 65-5-208 to -213 (Supp. 1996).

[8]Tenn. Code Ann. §§ 65-5-207, -208, -209(f), (h) (Supp. 1996).

[9]Tenn. Code Ann. § 65-4-124(a).

[10]Prior to 1995, the Commission could not permit new competitors to enter a market already served by another provider unless it found that the current service was "inadequate to meet the reasonable needs of the public." Tenn. Code Ann. § 65-4-203(a) (Supp. 1996). The 1995 legislation exempts telecommunications service providers from this requirement. Tenn. Code Ann. § 65-4-203(c). The 1995 legislation also permits new competitors to enter a market if they demonstrate that they will adhere to the applicable legal requirements and that they possess sufficient managerial, financial, and technical abilities to provide the service. Tenn. Code Ann. § 65-4-201(c).

[11]Tenn. Code Ann. § 65-5-209.

[12]Tenn. Code Ann. § 65-5-212, -213.  For the purposes of this program, a "small business" is one with annual gross revenues of less than $4,000,000. Tenn. Code Ann. § 65-5-212.

The transition procedure for existing local telephone companies was designed to be simple and expeditious. It requires an existing local telephone company desiring to take advantage of the new regulatory environment to file an application for a price regulation plan and envisions that the Commission will act on the application within ninety days. *See* Tenn. Code Ann. § 65-5-209(c). It requires the Commission to base its decision whether to grant the application on an audit of the applicant's most recent Form PSC-3.01 report. *See* Tenn. Code Ann. § 65-5-209(c), -209(j).

Tenn. Code Ann. § 65-5-209(c) states that the company's rates existing on June 6, 1995 will be the initial rates under its price regulation plan if the company's earned rate of return on its most recent Form PSC-3.01 report is less than its current authorized fair rate of return existing when the application was filed. The statute also empowers the Commission or Authority to initiate a contested rate-making proceeding if the audit of the Form PSC-3.01 report reveals that the company's earned rate of return is greater than its current authorized fair rate of return. Conversely, the statute permits the company to request a contested rate-making hearing if the audit reveals that its earned rate of return is less than its current authorized fair rate of return.

The Commission's revised regulatory reform rules took effect one week after the Governor signed the telecommunications reform legislation.[13] On June 20, 1995, BellSouth filed its application for a price regulation plan. On July 24, 1995, the Commission permitted AT&T Communications of the South Central States, Inc. to intervene in the proceeding. Approximately two weeks later, the Commission directed its staff to conduct the audit of BellSouth's most recent Form PSC-3.01 report in accordance with Tenn. Code Ann. § 65-5-209(c), (j).

On August 17, 1995, the Commission's staff issued the results of its audit of BellSouth's Form PSC-3.01 report for the twelve-month period ending on December 31, 1994. At the outset, the staff determined that, except for four minor discrepancies, BellSouth's December 1994 report accurately reflected the company's books and records, that it reflected the Commission's previously ordered rate-making adjustments, and that it complied with the generally accepted accounting principles

---

[13]Tenn. Comp. R. & Regs. r. 1220-4-2-.55 (1995).

as adopted in Part 32 of the Uniform System of Accounts. Accordingly, the staff concluded that BellSouth's corrected rate of return for 1994, as taken from its books, was 10.21%.

Even though BellSouth's corrected rate of return for 1994 was less than its authorized rate of return in the Commission's August 20, 1993 order, the Commission's staff decided that BellSouth's audited rate of return should be adjusted to reflect "out-of-period and non-recurring items" and "known charges" occurring during the audit period. Accordingly, the staff concluded that BellSouth's adjusted rate of return for 1994 was 12.29% and that this adjusted rate of return "more accurately reflects the earnings potential of the rates in effect at the end of the audit period." Since this adjusted rate of return exceeded BellSouth's currently authorized rate of return, the staff recommended that the Commission initiate a contested rate-making proceeding under Tenn. Code Ann. § 65-5-209(c) to establish the initial rates for Bell South's price regulation plan.

The staff's August 17, 1995 report and recommendations provoked a swift and strong reaction from BellSouth. On September 12, 1995, the company filed a petition for a declaratory order pursuant to Tenn. Code Ann. § 4-5-223(a) (1991) questioning the staff's authority to recommend adjustments to its corrected Form PSC-3.01 report. In the meantime, the Commission rejected the August 17, 1995 report because it was based on an incorrect Form PSC-3.01 report[14] and directed its staff to audit the proper Form PSC-3.01 report.

On September 15, 1995, the Commission's staff issued its second audit report - this time covering BellSouth's Form PSC-3.01 report for the twelve months ending on March 31, 1995. This report employed the same audit methodology used in the August 17, 1995 report. The staff made three corrections to BellSouth's Form PSC-3.01 report and then concluded that the corrected report accurately reflected the company's books and records and the Commission's previously ordered rate-making adjustments and that it complied with the generally accepted accounting principles

---

[14]Tenn. Code Ann. § 65-5-209(c) required an audit of the existing telephone company's most recent Form PSC-3.01 report available when the company filed its application for a price regulation plan. When BellSouth filed its application for a price regulation plan, it had already filed a Form PSC-3.01 report for the twelve months ending on March 31, 1995. This report, as opposed to the report for the twelve months ending on December 31, 1994, was BellSouth's most recent report.

as adopted in Part 32 of the Uniform System of Accounts. As a result of its corrections, the staff concluded that BellSouth's corrected rate of return for the twelve months ending on March 31, 1995 was 10.30%.[15]

The staff again recommended making "adjustments" to the results in BellSouth's Form PSC-3.01 report. It recommended fifteen "out-of-period" adjustments to remove items recorded on BellSouth's books during the twelve months ending on March 31, 1995 that applied to months prior to April 1994 and for items recorded outside the audit period that applied to the audit period. It recommended nine additional adjustments for abnormal or unusual expenses that were not expected to occur. Finally, it recommended twelve adjustments for "known changes" reflecting the annualized cost of rate changes or volume changes occurring during the period covered by the Form PSC-3.01 report. As a result of these adjustments, the Commission's staff concluded that BellSouth's adjusted rate of return was 12.74%. Since this adjusted rate of return exceeded BellSouth's currently authorized rate of return, the staff again recommended that the Commission initiate a contested rate-making proceeding to establish BellSouth's initial rates.

On September 20, 1995, the Commission accepted its staff's September 15, 1995 report and convened a contested case proceeding to set BellSouth's initial rates. Approximately one month later, it also convened a contested case proceeding to consider BellSouth's petition for a declaratory order concerning the staff's audit methodology and directed that the proceeding be consolidated with the pending contested rate-making proceeding. The consolidated proceeding commenced on November 1, 1995. After denying BellSouth's request for a declaratory order without permitting BellSouth to introduce proof substantiating its challenge to the staff's audit methodology and conclusions,[16] the Commission proceeded with the proof establishing a fair rate of return for BellSouth. On November 7, 1995, the Commission determined that BellSouth's rate of return should be 10.35% and, based

---

[15]BellSouth had reported a 10.20% earned rate of return on its Form PSC-3.01 report and contested the corrections made by the Commission's staff. We need not resolve this dispute here.

[16]The Commission entered an order on November 9, 1995 formally denying BellSouth's petition for a declaratory order. BellSouth filed a Tenn. R. App. P. 12 petition in this court on January 5, 1996, seeking appellate review of this order. *BellSouth Telecommunications, Inc. v. Greer,* App. No. 01A01-9601-BC-00008.

on the adjustments in its staff's September 15, 1995 report, directed BellSouth to reduce its rates by $56.285 million.

On November 20, 1995, the Commission resumed its hearing to consider recommendations from BellSouth, the Consumer Advocate, and AT&T concerning the most appropriate way to reduce BellSouth's rates by $56.285 million. On January 23, 1996, the Commission entered an order formally determining that BellSouth's rate of return should be 10.35% and, therefore, that BellSouth was earning $56.285 million in excess revenues. The Commission prescribed changes in BellSouth's rate design to eliminate these excess revenues[17] and determined that BellSouth's rates would be affordable for the purpose of Tenn. Code Ann. § 65-5-209(c) once these reductions were in place.

On February 14, 1996, BellSouth filed a Tenn. R. App. P. 12 petition to review the Commission's January 23, 1996 order. *BellSouth Telecommunications, Inc. v. Tennessee Pub. Serv. Comm'n,* App. No. 01A01-9602-BC-00066. On February 27, 1996, this court stayed the Commission's January 23, 1996 order and, in orders filed on February 27, 1996 and March 30, 1996, consolidated this appeal with two other related appeals by BellSouth.[18] On April 3, 1996, we clarified our earlier stay order by stating that it applied to both the rate reductions ordered by the Commission as well as the implementation of BellSouth's price regulation plan. On this appeal, both BellSouth and AT&T take issue with numerous aspects of the procedure and reasoning employed by the Commission to dispose of BellSouth's application for a price regulation plan under Tenn. Code Ann. § 65-5-209.

---

[17]The Commission allocated $21.5 million to reduce IntraLATA long distance message toll rates, $27.4 million to eliminate the $1.50 residential touchtone rates, and $7.4 million to eliminate the $1.00 zone charge. The Commission also directed BellSouth to waive the service connection charges for computer lines at schools and libraries and to provide a flat-rate option to customers who have expressed a desire to be included in Metro Area Calling.

[18]BellSouth had already appealed from an October 16, 1995 order entered by the Chancery Court of Davidson County dismissing its petition for a writ of mandamus to compel the Commission to implement its price regulation plan. *State ex rel. BellSouth Telecommunications, Inc. v. Bissell,* App. No. 01A01-9601-CH-00016. This appeal and the appeal from the Commission's denial of BellSouth's petition for a declaratory order, *BellSouth Telecommunications, Inc. v. Greer,* App. No. 01A01-9601-BC-00008, were consolidated with the appeal from the Commission's January 23, 1996 order. Later, on BellSouth's motion, we dismissed the appeal in the mandamus case on the grounds of mootness but reserved taxing costs pending the resolution of this appeal. *State ex rel. BellSouth Telecommunications, Inc. v. Bissell,* App. No. 01A01-9601-CH-00016 (Tenn. Ct. App. May 3, 1996).

## II.

### PREEMPTION BY THE TELECOMMUNICATIONS ACT OF 1996

As a threshold matter, we take up AT&T's assertion that this appeal should be remanded to enable the Authority to determine whether the federal Telecommunications Act of 1996 preempts state law authorizing BellSouth to begin operating under a price regulation plan.[19] AT&T claims that the preemption issue should be addressed before the approval of BellSouth's price regulation plan because the interconnection provisions in state law differ from those in the Telecommunications Act of 1996 and because state law contains no provision for modifying a price regulation plan once it has been approved. We have determined that the possibility of preemption is not so pressing that it requires a remand to the Authority for further proceedings.

### A.

Our federal system of government recognizes the dual sovereignty of the federal government and the various state governments. *Printz v. United States,* ___ U.S. ___, ___, 117 S. Ct. 2365, 2376 (1997); *Gregory v. Ashcroft,* 501 U.S. 452, 457, 111 S. Ct. 2395, 2399 (1991). The states possess sovereignty within their particular spheres concurrent with the federal government subject only to the limitations imposed by the Supremacy Clause, U.S. Const. art. VI, cl. 2. *Tafflin v. Levitt,* 493 U.S. 455, 458, 110 S. Ct. 792, 795 (1990).

The Supremacy Clause provides Congress with the power to preempt state law.[20] The courts are, however, reluctant to presume that preemption of state law has

---

[19]The Commission ceased to exist on June 30, 1996. While the General Assembly provided transition provisions with regard to the Commission's rules, employees and property, *see* Tenn. Code Ann. § 65-1-301 to -306 (Supp. 1996), it did not address the status of regulatory proceedings pending before the Commission or of pending judicial proceedings involving actions of the Commission. The members of the Authority did not succeed to the offices of the members of the Commission. However, the Authority has assumed the regulatory power formerly possessed by the Commission with regard to the matters at issue on this appeal. Accordingly, on July 16, 1996, we substituted the members of the Authority in place of the members of the Commission.

[20]Preemption may result from action by Congress itself or by action of a federal agency acting within the scope of its authority. *City of New York v. F.C.C.,* 486 U.S. 57, 63-64, 108 S. Ct. 1637, 1642 (1988); *Louisiana Pub. Serv. Comm'n v. F.C.C.,* 476 U.S. 355, 369, 106 S. Ct. 1890, 1898-99 (1986). Federal agencies must declare their intent to preempt state law with some specificity. *Schneidewind v. ANR Pipeline Co.,* 485 U.S. 293, 309 n.12, 108 S. Ct. 1145, 1155 n.12 (1988).

occurred. *Building & Constr. Trades Council v. Associated Builders & Contractors of Massachusetts/Rhode Island, Inc.,* 507 U.S. 218, 224, 113 S. Ct. 1190, 1194 (1993); *Exxon Corp. v. Governor of Maryland,* 437 U.S. 117, 132, 98 S. Ct. 2207, 2217 (1978). Thus, the courts work from the assumption that the historic powers of the states are not displaced by a federal statute unless that was the clear and manifest intent of Congress. *California Div. of Labor Standards Enforcement v. Dillingham Contr., N.A.,* ___ U.S. ___, ___, 117 S. Ct. 832, 838 (1997); *BFP v. Resolution Trust Corp.,* 511 U.S. 531, 544, 114 S. Ct. 1757, 1765 (1994); *Louisiana Pub. Serv. Comm'n v. F.C.C.,* 476 U.S. at 368, 106 S. Ct. at 1898.

Preemption occurs when there is an outright or actual conflict between federal and state law. *Freightliner Corp. v. Myrick,* 514 U.S. 280, 287, 115 S. Ct. 1483, 1487 (1995); *Louisiana Pub. Serv. Comm'n v. F.C.C.,* 476 U.S. at 368, 106 S. Ct. at 1898. It can also occur by implication when compliance with both federal and state law is impossible or when state law obstructs the accomplishment of Congress's objectives. *Boggs v. Boggs,* ___ U.S. ___, ___, 117 S. Ct. 1754, 1760-61 (1997); *CSX Transp., Inc. v. Easterwood,* 507 U.S. 658, 663, 113 S. Ct. 1732, 1737 (1993); *California Fed. Sav. & Loan Ass'n v. Guerra,* 479 U.S. 272, 281, 107 S. Ct. 683, 689 (1987). Preemption may also arise when Congress's legislation is so pervasive that it leaves no room for state legislative action. *Cipollone v. Liggett Group, Inc.,* 505 U.S. 504, 516, 112 S. Ct. 2608, 2617 (1992); *Louisiana Pub. Serv. Comm'n v. F.C.C.,* 476 U.S. at 368, 106 S. Ct. at 1898.

Preemption is basically a question of Congressional intent. *Barnett Bank of Marion County, N.A. v. Nelson,* ___ U.S. ___, ___, 116 S. Ct. 1103, 1107 (1996); *Hawaiian Airlines, Inc. v. Norris,* 512 U.S. 246, 252, 114 S. Ct. 2239, 2243 (1994); *R.J. Reynolds Tobacco Co. v. Durham County,* 479 U.S. 130, 140, 107 S. Ct. 499, 506 (1986). This intent must be reflected in the text and structure of the federal statute. *Ingersoll-Rand Co. v. McClendon,* 498 U.S. 133, 138, 111 S. Ct. 478, 482 (1990); *Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 95, 103 S. Ct. 2890, 2899 (1983). The best evidence of preemptive intent is an express preemption clause. *CSX Transp., Inc. v. Easterwood,* 507 U.S. at 664, 113 S. Ct. at 1737. However, in the absence of explicit preemption language, the courts must also examine the structure and purpose of the federal statute for implicit preemptory intent. *De Buono v. NYSA-ILA Medical & Clinical Servs. Fund,* ___ U.S. ___, ___, 117 S. Ct. 1747, 1751 (1997); *Barnett*

*Bank of Marion County, N.A. v. Nelson,* ___ U.S. at ___, 116 S. Ct. at 1108; *FMC Corp. v. Holliday,* 498 U.S. 52, 56-57, 111 S. Ct. 403, 407 (1990).

The courts begin their inquiry with the presumption that Congress did not intend to preempt state law. *Building & Constr. Trades Council v. Associated Builders & Contractors of Massachusetts/Rhode Island, Inc.,* 507 U.S. at 224, 113 S. Ct. at 1194. The proper approach is to reconcile the federal and state laws, *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Ware,* 414 U.S. 117, 127, 94 S. Ct. 383, 389-90 (1973), rather than to seek out conflict where none clearly exists. *Exxon Corp. v. Governor of Maryland,* 437 U.S. at 130, 98 S. Ct. at 2216. State law should be displaced by federal law only to the extent there is a conflict. *Dalton v. Little Rock Family Planning Servs.,* ___ U.S. ___, ___, 116 S. Ct. 1063, 1064 (1996).

## B.

AT&T asserts that the case should be remanded to the Authority to consider whether the Telecommunications Act of 1996 preempts state law because the federal Act's interconnection provisions differ from their state law counterparts. However, the mere existence of a federal regulatory program does not imply preemption of similar state laws. *English v. General Electric Co.,* 496 U.S. 72, 87, 110 S. Ct. 2270, 2279 (1990). Thus, AT&T must demonstrate something more if its preemption argument is to succeed.

The goals of the federal Telecommunications Act of 1996 and Tennessee's 1995 telecommunications legislation are similar.[21] Neither the federal Act nor the regulations promulgated by the Federal Communications Commission pursuant to the Act contain explicit preemption provisions. In fact, the Act specifically states that "[t]his Act and the amendments made by this Act shall not be construed to modify,

---

[21]The Telecommunications Act of 1996 "promotes competition and reduces regulation in order to secure lower prices and higher quality services for American telecommunications consumers and to encourage the rapid development of new telecommunications technologies." House Rpt. No. 104-204, 104th Cong., 2d Sess. 47, *reprinted in* 1996 U.S.C.C.A.N. 10, 11. One of the principal ways it accomplishes its goal is to impose a general duty of interconnection on all telecommunications carriers thereby requiring local telephone companies to offer competitors access to part of their networks. 47 U.S.C.A. § 251 (West Supp. 1997); House Rpt. No. 104-204, 104th Cong., 2d Sess. 48, *reprinted in* 1996 U.S.C.C.A.N. 10, 11. Tenn. Code Ann. § 65-4-123 states a similar purpose, and Tenn. Code Ann. § 65-4-124(a) (Supp. 1996) imposes a similar duty of interconnection on local telephone companies.

impair, or supersede Federal, State, or local law unless expressly provided in such Act or amendments." Telecommunications Act of 1996, § 601(c)(1), 47 U.S.C.A. § 152 note (West Supp. 1997). Congress included this provision to prevent "affected parties from asserting that the bill impliedly pre-empts other laws." House Conference Report No. 104-458, 104th Cong., 2d Sess., 201, *reprinted in* 1996 U.S.C.C.A.N. 124, 215. With specific reference to the interconnection issue, the Act also states that it should not be construed to prohibit state commissions from enforcing or promulgating regulations or from imposing additional requirements that "are necessary to further competition in the provision of telephone exchange service or exchange access" as long as they are "not inconsistent" with the Act. *See* 47 U.S.C.A. § 261(b), (c) (West Supp. 1997).[22]

The Telecommunications Act of 1996 contains no explicit preemption language and does not contain provisions that are in outright or actual conflict with state law. Accordingly, AT&T's preemption argument can succeed only if it can demonstrate that Congress's regulatory statutes have completely occupied the field, that it is impossible to comply with the requirements of both the federal and state law, or that the state law somehow obstructs the accomplishment of the objectives of the Telecommunications Act of 1996. AT&T has failed on all counts. Nothing in the text or structure of the Act supports its unfocused preemption claims.

Congress plainly did not desire to displace local telecommunications regulation when it enacted the Telecommunications Act of 1996. The Act itself makes it clear that state commissions play a pivotal role in implementing telecommunications policy. They provide a forum for resolving disputes between existing local telephone companies and their competitors seeking access to an existing telephone network. *See* 47 U.S.C.A. § 252. By the same token, the text of the Act and Tennessee's telecommunications statutes do not suggest that telephone companies will be unable to comply with the requirements of both or that compliance with the state statutes will somehow obstruct the objectives of the Telecommunications Act of 1996.

---

[22]*See also* 47 U.S.C.A. § 251(d)(3) (West Supp. 1997) which directs the Federal Communications Commission not to promulgate regulations that prevent state commissions from enforcing local regulations, orders, or policies (1) that establish local telephone companies' access and interconnection obligations, (2) that are "consistent" with the 47 U.S.C.A. § 251, and (3) that do not substantially prevent the implementation of the requirements of 47 U.S.C.A. § 251 or the Telecommunications Act of 1996.

AT&T has already invoked the remedies before the Authority made available by 47 U.S.C.A. § 252. In March 1996, it initiated interconnection negotiations with BellSouth. One month later, it requested BellSouth to provide information concerning BellSouth's costs for providing certain telecommunications services. After BellSouth declined to provide the information on the ground that it was not relevant to the interconnection negotiations, AT&T filed a petition in May 1996 requesting the Authority to resolve the dispute over the issue of access to the requested information. As far as this record shows, this proceeding remains before the Authority. This type of proceeding, and others like it, provide the parties with an appropriate forum to air out and resolve more clearly defined issues concerning the possible preemptive effect of specific provisions of the Telecommunications Act of 1996 or of the Federal Communications Commission's regulations.

## III.

### PRICE REGULATION PLANS UNDER TENN. CODE ANN. § 65-5-209

The determinative issues on this appeal involve the Commission's process for considering BellSouth's application for a price regulation plan. BellSouth essentially asserts that the Commission and its staff exceeded the plain mandate of Tenn. Code Ann. § 65-5-209. For its part, AT&T argues that the Commission did not go far enough in fashioning the details of BellSouth's price regulation plan. The resolution of these issues requires us to construe Tenn. Code Ann. § 65-5-209 and other related statutes enacted by the General Assembly in 1995 to foster the development of an efficient, technologically advanced, statewide system of telecommunications in Tennessee.

### A.

The search for the meaning of statutory language is a judicial function. *Roseman v. Roseman,* 890 S.W.2d 27, 29 (Tenn. 1994); *State ex rel. Weldon v. Thomason*, 142 Tenn. 527, 540, 221 S.W. 491, 495 (1920). Courts must ascertain and give the fullest possible effect to the statute without unduly restricting it or expanding it beyond its intended scope. *Perry v. Sentry Ins. Co.,* 938 S.W.2d 404, 406 (Tenn. 1996); *Kultura, Inc. v. Southern Leasing Corp.,* 923 S.W.2d 536, 539 (Tenn. 1996). At the same time, courts must avoid inquiring into the reasonableness of the statute

or substituting their own policy judgments for those of the legislature. *State v. Grosvenor,* 149 Tenn. 158, 167, 258 S.W. 140, 142 (1924); *State v. Henley,* 98 Tenn. 665, 679-81, 41 S.W. 352, 354-55 (1897); *Hamblen County Educ. Ass'n v. Hamblen County Bd. of Educ.,* 892 S.W.2d 428, 432 (Tenn. Ct. App. 1994).

When approaching statutory text, courts must also presume that the legislature says in a statute what it means and means in a statute what it says there. *Connecticut Nat'l Bank v. Germain,* 503 U.S. 249, 253-54, 112 S. Ct. 1146, 1149 (1992); *Worley v. Weigel's, Inc.,* 919 S.W.2d 589, 593 (Tenn. 1996). Accordingly, we must construe statutes as they are written, *Jackson v. Jackson,* 186 Tenn. 337, 342, 210 S.W.2d 332, 334 (1948), and our search for the meaning of statutory language must always begin with the statute itself. *Neff v. Cherokee Ins. Co.,* 704 S.W.2d 1, 3 (Tenn. 1986); *Pless v. Franks,* 202 Tenn. 630, 635, 308 S.W.2d 402, 404 (1957); *City of Nashville v. Kizer,* 194 Tenn. 357, 364, 250 S.W.2d 562, 564-65 (1952).

Statutory terms draw their meaning from the context of the entire statute, *Lyons v. Rasar,* 872 S.W.2d 895, 897 (Tenn. 1994); *Knox County ex rel. Kessel v. Lenoir City,* 837 S.W.2d 382, 387 (Tenn. 1992), and from the statute's general purpose. *City of Lenoir City v. State ex rel. City of Loudon,* 571 S.W.2d 297, 299 (Tenn. 1978); *Loftin v. Langsdon,* 813 S.W.2d 475, 478 (Tenn. Ct. App. 1991). We give these words their natural and ordinary meaning, *State ex rel. Metropolitan Gov't v. Spicewood Creek Watershed Dist.,* 848 S.W.2d 60, 62 (Tenn. 1993), unless the legislature used them in a specialized, technical sense. *Cordis Corp. v. Taylor,* 762 S.W.2d 138, 139-40 (Tenn. 1988).

The legislative process does not always produce precisely drawn laws. When the words of a statute are ambiguous or when it is just not clear what the legislature had in mind, courts may look beyond a statute's text for reliable guides to the statute's meaning. We consider the statute's historical background, the conditions giving rise to the statute, and the circumstances contemporaneous with the statute's enactment. *Still v. First Tenn. Bank, N.A.,* 900 S.W.2d 282, 284 (Tenn. 1995); *Mascari v. Raines,* 220 Tenn. 234, 239, 415 S.W.2d 874, 876 (1967); *Davis v. Aluminum Co. of Am.,* 204 Tenn. 135, 143, 316 S.W.2d 24, 27 (1958). We also resort to legislative history. *Storey v. Bradford Furniture Co. (In re Storey),* 910 S.W.2d

857, 859 (Tenn. 1995); *University Computing Co. v. Olsen,* 677 S.W.2d 445, 447 (Tenn. 1984); *Chapman v. Sullivan County,* 608 S.W.2d 580, 582 (Tenn. 1980).[23]

Courts consult legislative history not to delve into the personal, subjective motives of individual legislators, but rather to ascertain the meaning of the words in the statute. The subjective beliefs of legislators can never substitute for what was, in fact, enacted. There is a distinction between what the legislature intended to say in the law and what various legislators, as individuals, expected or hoped the consequences of the law would be. The answer to the former question is what courts pursue when they consult legislative history; the latter question is not within the courts' domain.

Relying on legislative history is a step to be taken cautiously. *Piper v. Chris-Craft Indus., Inc.,* 430 U.S. 1, 26, 97 S. Ct. 926, 941 (1977); *North & South Rivers Watershed Ass'n, Inc. v. Town of Scituate,* 949 F.2d 552, 556 n.6 (1st Cir. 1991). Legislative records are not always distinguished for their candor and accuracy, *Schwegmann Bros. v. Calvert Distillers Corp.,* 341 U.S. 384, 396, 71 S. Ct. 745, 751 (1951) (Jackson, J., concurring), and the more that courts have come to rely on legislative history, the less reliable it has become. Rather than reflecting the issues actually debated by the legislature, legislative history frequently consists of self-serving statements favorable to particular interest groups prepared and included in the legislative record solely to influence the courts' interpretation of the statute. *National Small Shipments Traffic Conf., Inc. v. Civil Aeronautics Bd.,* 618 F.2d 819, 828 (D.C. Cir. 1980); ANTONIN SCALIA, A MATTER OF INTERPRETATION: FEDERAL COURTS AND THE LAW 34 (1997); W. David Slawson, *Legislative History and the Need to Bring Statutory Interpretation Under the Rule of Law,* 44 Stan. L. Rev. 383, 397-98 (1992); Kenneth W. Starr, *Observations About the Use of Legislative History,* 1987 Duke L. J. 371, 377; Note, *Why Learned Hand Would Never Consult Legislative History Today,* 105 Harv. L. Rev. 1005, 1018-19 (1992).

Even the statements of sponsors during legislative debate should be evaluated cautiously. 2A Norman J. Singer, *Statutes and Statutory Construction* § 48:15 (rev.

---

[23]Some courts have even cited a statute's legislative history to buttress their interpretation when a statute is not ambiguous. *See, e.g., Worley v. Weigel's, Inc.,* 919 S.W.2d at 593; *VanArsdall v. State,* 919 S.W.2d 626, 632 (Tenn. Crim. App. 1995).

5th ed. 1992). These comments cannot alter the plain meaning of a statute., *D. Canale & Co. v. Celauro,* 765 S.W.2d 736, 738 (Tenn. 1989); *Elliott Crane Serv., Inc. v. H.G. Hill Stores, Inc.,* 840 S.W.2d 376, 379 (Tenn. Ct. App. 1992), because to do so would be to open the door to the inadvertent, or perhaps planned, undermining of statutory language. *Regan v. Wald,* 468 U.S. 222, 237, 104 S. Ct. 3026, 3035 (1984). Courts have no authority to adopt interpretations of statutes gleaned solely from legislative history that have no statutory reference points. *Shannon v. United States,* 512 U.S. 573, 583, 114 S. Ct. 2419, 2426 (1994). Accordingly, when a statute's text and legislative history disagree, the text controls. *Stromberg Metal Works, Inc. v. Press Mechanical,* 77 F.3d 928, 931 (7th Cir. 1996).

**B**.

**THE SCOPE OF A TENN. CODE ANN. § 65-5-209 AUDIT**

The pivotal dispute between BellSouth and the Commission involves the scope and purpose of the audit required by Tenn. Code Ann. § 65-5-209. BellSouth, citing the statute, asserts that the audit's sole purpose is to verify the accuracy of its most recent Form PSC-3.01 report. The Commission, citing a portion of the statute's legislative history, responds that the audit is more akin to a traditional earnings investigation and that its audit power under Tenn. Code Ann. § 65-5-209 includes the power to reduce a company's rate of return and to order the company to reduce its rates. We turn first to the statute itself for an answer to this dispute.

**1.**

The 1995 telecommunications reform legislation requires the Commission to set the initial rates of any incumbent local telephone company that applies for a price regulation plan. Tenn. Code Ann. § 65-5-209(c) requires that these initial rates must be the same as the applicant's existing rates if the rate of return on the company's most recent Form PSC-3.01 report is equal to or less than the company's currently authorized rate of return. The comparison of the company's existing rate of return with its currently authorized rate of return must be preceded by a staff audit of the company's most recent Form PSC-3.01 report conducted in accordance with Tenn. Code Ann. § 65-5-209(j).

Tenn. Code Ann. § 65-5-209(j) states that the purpose of the audit is "to assure that the Tennessee Regulatory Authority 3.01 report accurately reflects . . . the incumbent local exchange telephone company's achieved results." The audit must verify that the company reported its achieved results "in accordance with generally accepted accounting principles as adopted in Part 32 of the Uniform System of Accounts." It must also verify that the company's reported achieved results reflect "the ratemaking  adjustments to operating revenues, expenses and rate base used in the authority's most recent order applicable to the incumbent local exchange telephone company."

Since Tenn. Code Ann. § 65-5-209(a) directs the Commission to set an incumbent local telephone company's initial rates "[u]sing the procedures established in this section," the statute is the sole source of the Commission's authority to adopt a price regulation plan. It envisions an expeditious,[24] three-phase proceeding. The purpose of the first phase is to verify the accuracy of the information contained in the company's most recent Form PSC-3.01 report. *See* Tenn. Code Ann. § 65-5-209(j). The purpose of the second phase is to compare the company's reported rate of return with its currently authorized rate of return. *See* Tenn. Code Ann. § 65-5-209(c). No further proceedings are required if the company's rate of return based on its audited achieved results in its most recent Form PSC-3.01 report is equal to or less than its currently authorized rate of return. *See* Tenn. Code Ann. § 65-5-209(c). However, a third phase is required if the company's rate of return exceeds its currently authorized rate of return. The purpose of the third phase is to set the company's initial rates in a traditional, rate-setting proceeding.

Tenn. Code Ann. § 65-5-209 contains no specific language suggesting that the first or second phases of the proceeding have any of the attributes of a traditional rate-setting proceeding. The audit is conducted by the Commission's staff, and the staff has no specific statutory authority to make or recommend reductions in a company's rate of return. The term "audit" does not appear in any other statute or rule in conjunction with the Commission's rate-setting authority.[25]

_____

[24]Tenn. Code Ann. § 65-5-209(c) envisions that the process will be completed within ninety days after the company files its application for a price regulation plan.

[25]The term "audit" appears only twice in Title 65 of the Tennessee Code Annotated. Other than Tenn. Code Ann. § 65-5-209, it appear in Tenn. Code Ann. § 65-15-201 (Supp. 1996) which relates to "safety management audits" for motor carriers.

The textual analysis of Tenn. Code Ann. § 65-5-209 suggests that neither the Commission nor its staff has the power to adjust any of the figures contained in the applicant's Form PSC-3.01 report as long as these reports are correct, based on required auditing principles, and consistent with the Commission's previously ordered rate-making adjustments. The Commission, however, argues that the term "audit" can mean more than simply a "methodical examination of records with intent to verify their accuracy." *See National Health Corp. v. Snodgrass,* 555 S.W.2d 403, 405 (Tenn. 1977). It asserts that an audit under Tenn. Code Ann. § 65-5-209 includes investigating, deciding whether reported achieved results are accurate, and determining the weight to be given these reported results. Citing a staff memorandum that was read into the legislative record, the Commission insists that its Tenn. Code Ann. § 65-5-209 authority to audit includes the authority to determine whether the amounts reported on the Form PSC-3.01 "do not include unusual or abnormal financial occurrences," including "known charges."[26]

Tenn. Code Ann. § 65-5-209 does not specifically authorize adjustments for "unusual or abnormal financial occurrences." Nonetheless, because the General Assembly may have meant something different when it used the term "audit," we have reviewed the legislative history of Tenn. Code Ann. § 65-5-209 to determine

---

[26]The staff audit report dated September 15, 1995 explains that

the Staff has followed the statements of the sponsors of the Bills that became the new law by auditing the Company's financial records for the twelve months ended March 31, 1995, to determine if the amounts on the TPSC 3.01 Report:
* are accurately taken from the company's books and records;
* accurately reflect any Commission ordered rate making adjustments;
* do not include unusual or abnormal financial occurrences;
* were calculated following proper accounting rules and procedures for separating the company's interstate and intrastate operations, as well as, its regulated and nonregulated operations;
* accurately reflect allowable charges from affiliated companies.

These points were taken from a memo by Dr. Chris Klein, Director of the Utility Rate Division, and Mike Gaines, Manager of the Telecommunications Section, to PSC Chairman Keith Bissell in response to a letter from Senator Rochelle. This memo, and the transcripts of the "legislative intent" statements read by Senator Rochelle and Representative Purcell on the Senate and House floors, are attached as Appendices B, C, and D to this Report.

whether the General Assembly used the term "audit" in its common, ordinary meaning.

# 2.

The original substance of the telecommunications reform legislation was far different from the substance of the legislation that eventually became law. The original legislation contained no procedure for re-examining an incumbent local telephone company's rates. Instead, it simply provided that the company's "rates, terms and conditions for the services provided on February 1, 1995" were just and reasonable and that these rates would be the company's initial rates.[27] This provision encountered immediate opposition from the Consumer Advocate and other consumer groups because they believed that it would enable BellSouth to earn between $350 and $800 million in excess revenues.

The concern about excess revenues was the focus of the debate on April 11, 1995, when the Senate State and Local Government Committee considered the bill and a proposed amendment containing what would later become Tenn. Code Ann. § 65-5-209. Several committee members expressed concern about using BellSouth's existing rates because the Commission had not reviewed the company's rate of return since 1992. The Consumer Advocate pointed out that the proposed amendment substituted an "audit of . . . [the Form PSC-3.01 report] . . . for an earnings review." Whitfield Burcham, the former director of the Commission's Utility Rate Division who appeared on behalf of the American Association of Retired Persons, echoed the Consumer Advocate's concern about the efficacy of an audit of the Form PSC-3.01 report. He stated that "we believe that if you have an evidentiary hearing, there's a high probability that the evidence will show that the telephone company's prices need to be adjusted." These statements prompted Senator Cohen, the chair of the committee, and Senator Gilbert to suggest that there should be a full rate review before BellSouth's initial rates should be set. A BellSouth representative responded to this suggestion by stating that "[w]e don't feel that a rate hearing is necessary because we are earning within the authorized range."

---

[27]Senate Bill No. 891/House Bill No. 695, Section 6.

The Senate State and Local Government Committee convened on April 18, 1995 to continue its consideration of the bill. The hearing again focused on the advisability of conducting a "full-blown rate hearing" before approving BellSouth's initial rates. The Commission's General Utility Counsel described an audit of the Form PSC-3.01 report as follows:

> in order to audit the 3.01 statement . . . it's not just a matter of adding up math on a single sheet of paper. It's knowing that they [the company] have accurately reported those figures to us. So that we will send our auditors on site, they'll look at all the items as reported on the company's books and correlate that with the statement. And that's what we mean by a full audit . . . When the staff concludes their audit, and they may find some discrepancies or some items that need to be corrected, that'll be re-presented to the Commission for approval in a contested case format . . .

The current Director of the Utility Rate Division also informed the Committee that the Commission's staff had already commenced an audit of BellSouth and that they intended to proceed with the audit no matter which telecommunications bill passed. He explained that an audit of a Form PSC-3.01 report was an "historical audit" of the company's earnings for the preceding twelve months and that the staff planned to complete its work in September 1995.

Commissioner Steve Hewlett also pointed out to the Committee that "looking at the backup on a 3.01 is significantly different than a full blown audit." Mr. Burcham repeated that the Form PSC-3.01 report, which he designed, "wouldn't give you a representative picture of the future." In addition, he pointed out that he had objected to similar language in the Commission's proposed rule and that he had attempted "to get the Commission to change that language, and we were unsuccessful in doing that; and we think this language here is so restrictive that, really, you're not going to get an earnings investigation." The Consumer Advocate agreed with Mr. Burcham. He pointed out again that the Form PSC 3.01 report "doesn't accurately state what prices should be in the future" and that "the rate review only goes forward if you meet certain tests, and the test is whether or not the PSC 3.01 is within the range. If it's within the range, the different ranges, then there's no earnings review."

When the Senate State and Local Government Committee considered the bill again on April 25, 1995, Chairman Cohen offered an amendment requiring the continuation of rate hearings for basic telephone services through 1996. Senator Rochelle, the bill's sponsor, opposed this amendment on the ground that "rate of return regulation . . . encourages everybody to be fat; it encourages monopolistic practices; it encourages lack of innovation." After tabling Chairman Cohen's amendment, the Committee approved the bill as amended for passage by a 6 to 3 vote.

The debate over the need for a full-blown rate hearing before permitting incumbent local telephone companies to operate under a price regulation plan continued on the Senate floor on May 11, 1995 when the bill came up for third and final reading. Senator Rochelle offered an amendment to the bill containing what would later become Tenn. Code Ann. § 65-5-209(j)[28] and explained that "[t]here was a concern that they [the incumbent local telephone companies] could cook the books, and what this does is expressly state that the Commission shall conduct an audit of the audit to verify that the figures are correct." After the Senate tabled Senator Cohen's motion to invite Mr. Burcham to address them concerning Senator Rochelle's amendment, Senator Rochelle reiterated that the purpose of his amendment was to "[set] out very exactly that the Public Service Commission has the . . . power to do a full blown audit of that audit [the Form PSC-3.01 report] to make sure they've been given correct figures." He also stated categorically that this amendment "doesn't address rate setting. This addresses auditing of an audit."

Upon hearing Senator Rochelle's explanation of his proposed amendment, other senators, including Senators Cohen, Cooper, and Gilbert pointed out that the amendment would permit the Commission to make sure that the numbers are correct but not to go behind the numbers. These senators asserted that the Commission should conduct a traditional earnings investigation before approving an incumbent local telephone company's initial rates. Senator Rochelle opposed these suggestions on the ground that the rate hearings demanded by these senators would be a "three-

---

[28]*See* Amendment No. 2 to Amendment No. 2, Senate Journal of the Ninety-Ninth General Assembly of the State of Tennessee, First Session, 1157-58 (1995) ("Senate Journal").

year ordeal." The Senate finally adopted Senator Rochelle's amendment on a voice vote.[29]

The adoption of Senator Rochelle's amendment did not end the matter. The Senate considered and defeated three other amendments that would have replaced the audit of the Form PSC-3.01 report with a more traditional rate proceeding. One amendment would have authorized the Commission to conduct a contested case proceeding "to determine the justness and reasonableness of the existing rates" and to "make appropriate adjustments to arrive at just and reasonable rates."[30] Another amendment was to the same effect.[31] The third amendment would have required the Commission to "make public the anticipated revenues and profits each provider will make under such plan."[32]

Senator Rochelle opposed each of these amendments on the ground that they were motivated by the "greed" of BellSouth's competitors who desired to delay the company's ability to compete in a less regulated market. He disagreed with Senator Gilbert's observation that it would make "better sense to have a full evidentiary hearing before we turn those market forces loose." When asked by Senator Gilbert to point out the language in his amendment that permitted the Commission to adjust the rate "if there is a problem with the audit or that things have not been stated as they should have been stated," Senator Rochelle responded:

> [W]e're using the existing rules that have already been adopted by the PSC and that gives them the ability to set the rates. It wouldn't be in the bill. We're using existing practices, rules, and statutes.

In response to Senator Rochelle's explanation, Senator Gilbert then pointed out to his colleagues that

> We're passing a statutory scheme that may be interpreted to override every one of those existing rules. Let me tell you why he can't point to any language in subsection (c) that tells you that the PSC will change . . . the rates if they find out through their audit that something's wrong,

---

[29]Senate Journal, at 1159.

[30]Amendment No. 8 was tabled by a vote of 18 to 15. *See* Senate Journal, at 1160.

[31]Amendment No. 9 failed by a vote of 13 to 16. *See* Senate Journal, at 1164-65.

[32]Amendment No. 18 failed under Senate Rule 39(3) by a vote of 11 to 19 to 1. *See* Senate Journal, at 1167.

> because there isn't any language in that section that allows
> them to do that.

Senator Rochelle ended the colloquy by pointing out that the Commission could adjust the rates if it determined that BellSouth's earnings were above the company's authorized rate of return. The Senate thereafter approved the amended version of Senate Bill No. 891 by 24 to 8 to 1 vote and sent the bill to the House of Representatives.[33]

The House leadership was not satisfied with the Senate's version of the bill. Accordingly, when Senate Bill 891 came on for third and final reading on May 24, 1995, Representative Purcell, one of the bill's House sponsors, convinced his colleagues to adopt an amendment that added several new provisions to the Senate's version of the bill. This amendment contained the restated version of the telecommunications policy that now appears in Tenn. Code Ann. § 65-4-123,[34] the provision requiring the General Assembly to review the implementation of the Act every two years that now appears in Tenn. Code Ann. § 65-5-211 (Supp. 1996),[35] and the provisions creating a $10 million small and minority telecommunications business assistance program that now appear in Tenn. Code Ann. §§ 65-5-212, -213.[36]

The House amendment did not alter the portions of the Senate amendment containing Tenn. Code Ann. § 65-5-209(c) and adding the language that was to become Tenn. Code Ann. § 65-5-209(j). In fact, the differences between an earnings investigation and an audit of a Form PSC-3.01 report that had preoccupied the Senate were never mentioned during the House discussion of the bill. In his closing remarks after the House cut off further debate on the bill, Representative Purcell told his colleagues:

> I need to, at this point, with your indulgence, read three
> brief statements into the record for legislative intent
> purposes as this bill leaves this House and goes to the
> Senate. The first was requested by the AARP. The audit

---

[33]Senate Journal, at 1168.

[34]Amendment No. 17, § 1, 2 House Journal of the Ninety-Ninth General Assembly of the State of Tennessee, First Session, 1847 (1995) ("House Journal").

[35]Amendment No. 17, § 15, House Journal, at 1858.

[36]Amendment No. 17, § 17, House Journal, at 1859-60.

provisions in this bill were requested by the AARP, and it was their hope that we would, as a matter of legislative intent, make it clear what we mean. And so, let me say on the subject of Section 13, legislative intent is that this bill establishes a process by which consumers are assured affordable rates. To achieve this, the bill provides that the rates of incumbent local exchange companies will be based on an audit of the company's actual achieved results and not on a speculative forecast.

An audit consistent with the provisions of this bill is currently being performed by the TPSC staff by their compliance unit of SCB's TPC 3.01 form. As stated by Dr. Chris Klein, Director of the PSC's Utility Rate Division, in a letter sent earlier this year,[37] the TPSC 3.01 form is a monthly report showing monthly, year-to-date, and twelve month-to-date financial information including rate of return, adjusted to reflect the Commission's prior rate-making decision. The compliance audit verifies that the amounts shown on the TPSC 3.01, (1) are actually taken from the company's books and records; (2) accurately reflect any Commission order of rate making adjustments; (3) do not include unusual or abnormal financial occurrences; (4) were calculated following proper accounting rules and procedures for separating the company's interstate and intrastate operations, as well as its regulated and non-regulated operations; and finally, accurately reflect allowable charges from affiliated companies.

Section 13 makes clear that this TPSC 3.01 compliance audit of actual achieved results and without speculative forecasts will be completed, and affordable rates will be set pursuant to Section 10 (c) and (j) of this bill.[38]

*See* House Journal, at 1865. The House then passed Senate Bill No. 891 by an 89 to 8 vote.[39]

---

[37]Representative Purcell is referring to an April 13, 1995 memorandum from Chris Klein and Mike Gaines to Chairman Keith Bissell. The memorandum describes the intended scope of the compliance audit that had already been initiated by the Commission in March 1995. The Commission's staff later cited this memorandum as authority for the scope of the audit of BellSouth's most recent Form PSC-3.01 report on which its September 15, 1995 report was based.

[38]Representative Purcell's description of the scope of the compliance audit was drawn completely from the April memorandum written by Messrs. Klein and Gaines. The version of his remarks appearing in the House Journal contains minor, nonsubstantive differences with his actual remarks on the House floor. *See* House Journal, at 1865.

[39]*See* House Journal, at 1864. The House Journal infers that Representative Purcell's remarks followed the final vote on the bill; however, the tapes of the legislative debates show to the contrary.

The bill containing the House amendments was returned to the Senate and was called up for consideration on May 25, 1995. On this occasion, Senator Rochelle read the same statement that Representative Purcell had read the previous day. When asked to explain how the amended bill would assure affordable telephone service, Senator Rochelle replied

> we have read . . . for legislative intent purposes, the language requested that helped everybody understand that the authority of the Consumer Advocate and the authority of the PSC and such as that remains in place and is there to . . . help insure that all reports, audits and such as that are based on actual figures, not speculative forecasts and such as that. So I would refer you to the statement of legislative intent, and to the language that's previously been in the bill, plus the language in Amendment No. 2 to 2.

When asked how the House's version of the bill differed from the Senate's version, Senator Rochelle explained that the principal change was the creation of the fund for small and minority businesses and that "there are language changes, of course, but they were changes that were worked out with the AARP, they were after consultation with the AARP, Mr. Burcham, and these other folks." The Senate proceeded to concur in the House amendments by a 23 to 10 vote.[40] Both Senator Rochelle and Senator Gilbert, who had voted against the bill and the House amendments, requested that Senator Rochelle's statements concerning the scope of the audit of the Form PSC-3.01 report be included verbatim in the Senate Journal.[41]

### 3.

The legislative history of Tenn. Code Ann. § 65-5-209 reveals several significant milestones in the formulation of this statute. The original version of the bill contained no procedure of any sort for reviewing incumbent local telephone companies' rates. The bill's critics objected to this omission because they believed that it would enable the telephone companies to earn excessive profits and argued that the Commission should hold one last "full blown" traditional earnings investigation before the competitive market forces were turned loose. The bill's proponents opposed this suggestion and proposed instead that the Commission audit the telephone companies' most recent Form PSC-3.01 report. Their adversaries asserted

---

[40]*See* Senate Journal, at 1631.

[41]*See* Senate Journal, at 1631-32.

that this proposal did not go far enough because auditing the Form PSC-3.01 report would not provide a representative picture of the companies' future earnings. The only concession that the bill's proponents were willing to make was to specifically empower the Commission to satisfy itself that the information on the Form PSC-3.01 report was accurate. The opponents tried repeatedly to convince their legislative colleagues to require one last traditional rate-setting proceeding. When they were rebuffed three times, they abandoned their efforts to amend the bill and resorted to the tactic of including a statement in the legislative record containing an interpretation of the legislation similar to the position that their colleagues had repeatedly declined to adopt.

The statements concerning the scope of the audit read into the record by Senator Rochelle and Representative Purcell are inconsistent with the language of Tenn. Code Ann. § 65-5-209. By its own terms, this statute, not the Commission's other statutes and regulations, governs the manner in which the Commission must consider and act upon applications for price regulation plans. The Commission's powers under Tenn. Code Ann. § 65-5-209 are more limited than its powers in the context of a traditional earnings investigation, as long as the company's rate of return on its Form PSC-3.01 report is less than its currently authorized rate of return.

The Commission, like any other administrative agency, must conform its actions to its enabling legislation. *Tennessee Pub. Serv. Comm'n v. Southern Ry.,* 554 S.W.2d 612, 613 (Tenn. 1977); *Pharr v. Nashville, C. & St. L. Ry.,* 186 Tenn. 154, 161, 208 S.W.2d 1013, 1016 (1948). It has no authority or power except that found in the statutes. *Tennessee-Carolina Transp., Inc. v. Pentecost,* 206 Tenn. 551, 556, 334 S.W.2d 950, 953 (1960). While its statutes are remedial and should be interpreted liberally, *see* Tenn. Code Ann. § 65-4-106 (Supp. 1996), they should not be construed so broadly as to permit the Commission to exercise authority not specifically granted by law. *Pharr v. Nashville, C. & St. L. Ry.,* 186 Tenn. at 161, 208 S.W.2d at 1016.

Both the language of Tenn. Code Ann. § 65-5-209 and its legislative history confirm that the General Assembly established a three-phase process for considering applications for a price regulation plan. The first and second phases involve verifying the accuracy of the information in the applicant's Form PSC-3.01 report and

comparing the applicant's reported rate of return with its currently authorized rate of return. During these phases, the Commission and its staff are empowered to audit the applicant's most recent Form PSC-3.01 report for three purposes: (1) to verify that the information on the report accurately reflects the information in the applicant's books and records, (2) to verify that the report was prepared consistently with generally accepted accounting principles, and (3) to verify that the applicant's calculations reflected the Commission's previously issued orders. The Commission's authority to adjust the figures on the Form PSC-3.01 report is limited to correcting errors with regard to these three categories. The Commission may only adjust an applicant's rate of return after it determines that the rate of return reported on the applicant's most recent Form PSC-3.01 report exceeds the applicant's currently authorized rate of return.

The Commission exceeded its authority under Tenn. Code Ann. § 65-5-209(c) & (j) by adjusting the figures in BellSouth's Form PSC-3.01 report to compensate for out of period items, abnormal or unusual expenses, and known charges. It had already concurred with its staff's conclusion that the rate of return on BellSouth's corrected Form PSC-3.01 report was 10.30%. Since this rate of return did not exceed BellSouth's currently authorized rate of return of between 10.65 and 11.85%, the Commission should have found that BellSouth's existing rates were affordable under Tenn. Code Ann. § 65-5-209(a) and should have approved BellSouth's application for a price regulation plan based on BellSouth's rates existing on June 6, 1995 as required by Tenn. Code Ann. § 65-5-209(c).

## C.
### BELLSOUTH'S RIGHT TO A CONTESTED CASE HEARING

BellSouth also asserts that the Commission should have granted its request for a contested case hearing to challenge the legal and factual basis for the adjustments to BellSouth's Form PSC-3.01 report. The Commission responds that BellSouth is not entitled to a contested case hearing because the first two phases of a Tenn. Code Ann. § 65-5-209 proceeding are essentially an audit, and an audit is not a contested case. The Commission overlooks two significant points. First, BellSouth desired to challenge the Commission's interpretation and use of its staff's audit. Second, the Commission's use of the audit affected BellSouth's legal rights and privileges.

The Commission relies on *National Health Corp. v. Snodgrass,* 555 S.W.2d 403 (Tenn. 1977) to support its argument; however, this case is significantly different from the one before us. In *National Health Corp.,* the state comptroller audited several related intermediate care facilities to determine whether their charges were consistent with federal and state law. After the auditors concluded that the company had overcharged the State, the Department of Public Health informed National Health Corp. that it intended to withhold a portion of its next regularly scheduled payment to offset the overcharge. Instead of proceeding against the Department of Public Health, National Health Corp. sought judicial review of the comptroller's audit under the Uniform Administrative Procedures Act.

The Chancery Court for Davidson County dismissed National Health Corp.'s petition for review under Tenn. Code Ann. § 4-5-322 (Supp. 1996) based on its conclusion that the comptroller's audit reports were not contested cases, and the Tennessee Supreme Court affirmed the decision. The court concluded that the audit was not a contested case because an audit

> in and of itself, does not determine any legal rights, duties or privileges of any party to the audit. It is merely a report of factual material, with recommendations of the auditor. If some action is taken or decision is made by a state official based on the audit report, the decision made or action taken may constitute a "contested case," but not the audit or the report based on the audit, which at most would be only "evidence" to support the decision or action taken.

*National Health Corp. v. Snodgrass,* 555 S.W.2d at 405-06.

BellSouth has the right to have its application for a price regulation plan considered in accordance with Tenn. Code Ann. § 65-5-209. It also has the right to base its initial rates on its existing rates if its earned rate of return does not exceed its currently authorized rate of return. The Commission's decision to trigger a rate-setting proceeding by adjusting the figures on BellSouth's Form PSC-3.01 report affected BellSouth's rights. While the Commission permitted BellSouth to present legal arguments concerning its authority to adjust its Form PSC-3.01 report, it did not provide BellSouth with an opportunity to prove that the staff's findings or conclusions with regard to the "out-of-period adjustments," "abnormal or unusual expenses," and "known charges" were factually incorrect. Given the interests at

stake, the Commission should have permitted BellSouth to prove that the suggested adjustments
were incorrect or not supported by the facts.

## IV.

### REVIEW OF ALL BELLSOUTH'S RATES AND TARIFFS

AT&T also argues that the Commission did not complete its task because it failed to review each of BellSouth's rates and tariffs to determine whether they were affordable and non-discriminatory.[42] We need not address this issue in light of our holding that the Commission should have approved BellSouth's application for a price regulation plan based on the rates in existence on June 6, 1995. Since the Commission had already determined that these rates and tariffs were just and reasonable and nondiscriminatory, it is not required to make this determination again absent some specific reason to do so.

## V.

In summary, we vacate the Commission's January 23, 1996 order and all related earlier orders with regard to BellSouth's application for a price regulation plan. Since the Commission has adopted its staff's conclusion that BellSouth's rate of return reported on its Form PSC-3.01 report for the twelve months ending March 31, 1995 is less than its current authorized rate of return, we remand the case to the Tennessee Regulatory Authority with directions to approve BellSouth's application for a price regulation plan. In light of our conclusion that the Commission did not have the authority to adjust the actual results on BellSouth's Form PSC-3.01 report, we need not consider the remaining issues raised by BellSouth and AT&T. These issues and all other issues raised by the parties are accordingly pretermitted.

We tax the costs of this appeal which includes *BellSouth Telecommunications, Inc. v. Greer,* App. No. 01A01-9601-BC-00008 and *BellSouth Telecommunications,*

---

[42]AT&T made a similar argument with regard to the Commission's approval of the price regulation plan for United Telephone Southeast, Inc. This court did not reach the substance of this argument because a majority of the panel that heard the case concluded that the court lacked jurisdiction over the appeal. *AT&T Communications of the South Central States, Inc. v. Greer,* App. No. 01A01-9512-BC-00556, 1996 WL 697945, at 7 (Tenn. Ct. App. Dec. 6, 1996) (No Tenn. R. App. P. 11 application filed).

*Inc. v. Tennessee Pub. Serv. Comm'n,* App. No. 01A01-9602-BC-00066 to the Tennessee Regulatory Authority. We tax the costs of the appeal in *State ex rel. BellSouth Telecommunications, Inc. v. Bissell,* App. No. 01A01-9601-CH-00016 to BellSouth Telecommunications, Inc. and its surety for which execution, if necessary, may issue.

-31-

_____
WILLIAM C. KOCH, JR., JUDGE

CONCUR:


_____
SAMUEL L. LEWIS, JUDGE


_____
BEN H. CANTRELL, JUDGE