# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON
### July 20, 2004 Session

## PAMELA D. VICKROY
### v.
## PATHWAYS, INC., DYERSBURG, TN, KIMBERLY BOYD, J. FOREST-LAM, M.D., METHODIST HOSPITALS OF DYERSBURG, TN, COLEMAN FOSS, ADMINISTRATOR, AND WESTERN MENTAL HEALTH INSTITUTE, BOLIVAR, TN

### An Appeal from the Circuit Court for Dyer County
### No. 02-71    R. Lee Moore, Jr., Judge

---

### No. W2003-02620-COA-R3-CV - Filed December 30, 2004

---

This case involves involuntary commitment to a mental institution. Paramedics were called to the plaintiff's home by her roommate, and she was brought involuntarily to the hospital for evaluation. She was admitted to the emergency room and examined by the physician on duty. She was interviewed by a mental health clinician. The physician then went off duty and the defendant physician took charge. The defendant physician examined the patient's chart, reviewed the history taken by the prior physician and the mental health clinician, and then signed a form committing the plaintiff to a mental institution. The form stated that the defendant physician had examined the plaintiff, but the plaintiff was examined only by the prior physician, who was no longer on duty. The plaintiff then sued the defendant physician for involuntarily committing her to a mental institution without personally examining her. The trial court granted summary judgment to the defendant physician, classifying the action as medical malpractice and finding that the plaintiff failed to offer competent expert proof as required under T.C.A. § 29-26-115. We affirm the grant of summary judgment as to claims of medical malpractice, and reverse the grant of summary judgment for the claims of negligence and false imprisonment, finding that T.C.A. § 36-6-402 requires that a physician or designated professional who commits a patient to a mental institution must first personally examine the patient, rather than relying exclusively on medical records or someone else's examination of the patient.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court is Affirmed in Part and Reversed in Part

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which W. FRANK CRAWFORD, P.J., W.S. and DAVID R. FARMER, J., joined.

Louis R. Lucas, Memphis, for plaintiff Pamela D. Vickroy.

Marty R. Phillips and Craig P. Sanders, Jackson, for appellee James Forest-Lam, M.D.


**OPINION**

The week of February 4, 2001, Plaintiff/Appellant Pamela Vickroy ("Vickroy") had been sick for several days, staying inside the apartment she shared with two roommates. On February 4, 2001, one of the roommates called police officers to the apartment because Vickroy refused to come out of the bathroom and they were concerned for her. When the officers arrived, Vickroy still refused to come out of the bathroom. Vickroy's roommates reported to the officers that Vickroy had been acting strangely, and that she took medication for bipolar disorder. The officers then called an ambulance and paramedics responded to the scene. One of the paramedics convinced Vickroy to leave the bathroom. When Vickroy came out, she yelled angrily at her roommate for calling the police and pointed at her. As a result, the paramedics took Vickroy to the emergency room at Methodist Hospital in Dyersburg, Tennessee, to be examined.

When Vickroy arrived at the hospital, the physician on duty, Joseph Cook, M.D. ("Dr. Cook"), examined her and ordered lab work. Since Vickroy had been a patient at Pathways of Tennessee, Inc. ("Pathways"), a mental health facility, Dr. Cook ordered a consultation with Pathways. Pathways sent to the hospital a crisis clinician, Kimberly Boyd, who interviewed Vickroy. At some point, Dr. Cook signed a hospital form that listed Vickroy's diagnosis as influenza and discharged her to her home. The form signed off to Defendant/Appellee James Forest-Lam, M.D. ("Dr. Forest-Lam"), who took over as the emergency room physician when Dr. Cook left. Dr. Cook then went off duty and left the hospital.

Vickroy remained in the emergency room. When Dr. Forest-Lam came on duty, he reviewed Vickroy's chart and the information provided by the crisis clinician from Pathways. The chart included the results of Dr. Cook's physical examination of Vickroy, which noted her bipolar disorder, all of her physical symptoms, said that her physical symptoms began five days earlier, stated that Vickroy "assaulted her roommate," and checked the blanks on the form indicating that Vickroy was "oriented x 3" and "mood/affect nml." The admission document completed by the paramedic who brought Vickroy to the emergency room stated that Vickroy was "depressed" and that she was arrested and brought to the hospital after a "confrontation." A form signed by the Pathways clinician Kimberly Boyd listed Vickroy's diagnosis as "Bipolar Disorder NOS," and showed her as an active Pathways patient taking lithium and other medications.[1] Based on this information, Dr. Forest-Lam signed a "Certificate of Need for Emergency Admission Under Tennessee Code Annotated Section 33-6-103(c)" to have Vickroy transferred to Western Mental Health Institute ("Western") in Bolivar, Tennessee. The form stated: "I, *James Forest-Lam*, of the County of *Dyer*, State of Tennessee, certify

---

[1]Surprisingly, the hospital record does not include a document signed by Boyd summarizing the results of her interview with Vickroy.

that I have personally examined *Vickroy, Pam* on *2/4*, 2001." The form stated that, in Dr. Forest-Lam's professional opinion, based on the examination and the information provided to him, Dr. Forest-Lam certified that Vickroy:

   1. Is mentally ill as shown by the following facts and reasons: *Client states she is thinking about hurting herself because she can not take it any more. Client states she can not remember if she tried to hurt herself today. Client states she has a past history of suicide attempts. Client tried to hurt her roommate tonight, but doesn't remember.*

   2. poses an immediate likelihood of serious harm because of the mental illness as shown by the following reasons:
   *Client states she doesn't remember if she tried to hurt herself or anyone else. Client states she has been thinking about hurting herself because she can not take it any more. Client's mood keeps changing. Client assaulted her roommate tonight, but doesn't remember.*

   3. needs care, training or treatment because of the metal illness as shown by the following facts and reasons:
   *Client is hearing voices. Client states she can not make out what the voices are saying. Client states she has not been eating nor sleeping. Client has not been compliant with her medications.*

   4. all available less drastic alternatives to placement in a hospital or treatment resource are unsuitable to meet the needs of the person as shown by the following facts and reasons: *Client is refusing to sign herself in voluntary. Client has not been compliant with her medications.*

Dr. Forest-Lam therefore concluded that Vickroy posed an immediate likelihood of serious harm to herself and others.[2] On this basis, Dr. Forest-Lam signed the Certificate of Need involuntarily committing Vickroy to Western.

   Vickroy was then taken to the Dyersburg sheriff's office, where she was shackled to a chair for three hours. Thereafter, a police officer drove her to Western in Bolivar, Tennessee. Upon arrival at Western, Vickroy was examined again and held for further evaluation. She was released on February 14, 2002.

   After Vickroy was released from Western, she filed a grievance with Pathways and complained to Methodist Hospital. Vickroy exchanged email correspondence with the Administrator

---

[2]The numbered paragraphs on the form detailing what Vickroy had reportedly said and that she was hearing voices did not appear to be in Dr. Forest-Lam's handwriting, although the record does not state what other person or persons assisted in completing the form.

of the Hospital, Coleman Foss ("Foss"), in which she maintained that she never threatened suicide and sought to meet with Dr. Forest-Lam to ask him "why he sent me to Bolivar without so much as introducing himself to me." Foss responded to Vickroy's request by sending her an email stating that he had spoken with Dr. Forest-Lam, who asked Foss "to convey the following:"

> He understands your frustration but once a statement has been made and witnessed by authorities that someone is considering taking drastic action (i.e., suicide) he is compelled to follow through on the order for internment.
>
> I realize that you yourself said you did not make such a statement but apparently he was informed that you did and followed through accordingly. He also indicated that he felt that there was nothing more to discuss on the matter.

After receiving this response, Vickroy filed this lawsuit.

Vickroy filed suit against Pathways, Inc.; Kimberly Boyd; J. Forest-Lam M.D.; Methodist Hospitals of Dyersburg; Coleman Foss, Administrator; and Western Mental Health Institute. In the initial complaint, Vickroy asserted that the defendants were negligent and that she suffered "physical and emotional distress and ha[d] been deprived of her liberty without just cause." As to Dr. Forest-Lam, Vickroy alleged:

> The Defendant, J. Forest-Lam, M.D. never "personally" examined the Plaintiff. He did not make any personal judgment as to her condition and signed a false certification causing Plaintiff to be transported to Western State Mental Hospital in Bolivar, Tennessee against her will and without proper cause. The actions of Dr. Forest-Lam and of Methodist Hospital, Dyersburg were negligent and caused serious emotional distress and unlawful restraint on the liberty of the Plaintiff herein.

She requested an injunction to remove all reports relating to this incident from her medical records, and sought compensatory damages in the amount of $3,500,000 and punitive damages in the amount of $1,000,000.

Discovery ensued. Subsequently, Vickroy voluntarily dismissed the claim against Western. Pathways and Boyd were granted summary judgment based on Pathways' immunity as a governmental entity and Boyd's status as a Pathways employee. The remaining defendants, Methodist Hospital, Foss, and Dr. Forest-Lam filed motions for summary judgment based on Vickroy's failure to provide medical experts by the deadline established in the scheduling order.

In an order dated July 25, 2003, the trial court extended the deadline from the previous scheduling order and ordered Vickroy to file any affidavits in response to the motions for summary judgment by August 22, 2003. In response, Vickroy provided an affidavit from one expert, Daniel Menkes, M.D. In the affidavit, Dr. Menkes indicated that he is a medical school professor in Memphis, that he had not yet had an opportunity to prepare an expert opinion report, and that Dr.

Forest-Lam's act of signing Vickroy's commitment papers without having personally conducted a physical and mental examination of her was "a violation of the community standards of best medical practice in the State of Tennessee."

On September 30, 2003, a hearing was held on the motions for summary judgment. At the hearing, the defendants characterized Vickroy's cause of action as medical malpractice. They argued that Vickroy did not meet the burden of producing a competent medical expert under Tennessee Code Annotated Section 29-26-115[3] because the affidavit of Dr. Menkes did not establish that he was familiar with the standard of care for emergency room physicians in Dyer County, and also did not establish causation of Vickroy's injury.

Vickroy argued that no expert testimony was needed because Tennessee Code Annotated Section 33-6-404 established as a matter of law that the standard of care required the physician who orders a patient committed to a mental institution to have first personally examined the patient. Section 33-6-404 states:

> IF
> (1)(A) a licensed physician, psychologist, or designated professional takes a person into custody under Section 33-6-402; OR

---

[3] Tennessee Code Annotated Section 29-26-115 (a) - (b) states:

a) In a malpractice action, the claimant shall have the burden of proving by evidence as provided by subsection (b):

(1) The recognized standard of acceptable professional practice in the profession and the specialty thereof, if any, that the defendant practices in the community in which the defendant practices or in a similar community at the time the alleged injury or wrongful action occurred;

(2) That the defendant acted with less than or failed to act with ordinary and reasonable care in accordance with such standard; and

(3) As a proximate result of the defendant's negligent act or omission, the plaintiff suffered injuries which would not otherwise have occurred.

(b) No person in a health care profession requiring licensure under the laws of this state shall be competent to testify in any court of law to establish the facts required to be established by subsection (a), unless the person was licensed to practice in the state or a contiguous bordering state a profession or specialty which would make the person's expert testimony relevant to the issues in the case and had practiced this profession or specialty in one (1) of these states during the year preceding the date that the alleged injury or wrongful act occurred. This rule shall apply to expert witnesses testifying for the defendant as rebuttal witnesses. The court may waive this subsection when it determines that the appropriate witnesses otherwise would not be available.

TENN. CODE ANN. § 29-26-115(a)-(b) (2001).

(B) a person is brought to such a physician, psychologist, or designated professional for examination under this section,

THEN
(2) *the physician, psychologist, or designated professional shall immediately examine the person and decide whether the person is subject to admission to a hospital or treatment resource under Section 33-6-403, AND*

(3)(A) IF
(I) the person is not subject to admission, THEN

(ii) the physician, psychologist, or designated professional shall release the person, AND

(B) IF (I) the person is subject to admission, THEN *(ii) the physician, psychologist, or designated professional shall complete a certificate of need for such emergency diagnosis, evaluation, and treatment showing the factual foundation for the conclusions on each item of Section 33-6-403,* AND (iii) the physician, psychologist, or designated professional shall assess the person's clinical needs and need for physical restraint or vehicle security and determine the mode of transportation to the hospital in consultation with the mandatory pre-screening agent, other mental health professional familiar with the person, or a knowledgeable family member.

Tenn. Code Ann. § 33-6-404 (2001) (emphasis added). Vickroy noted that her claim is not based on a theory of medical malpractice. Rather, her cause of action is based on the undisputed evidence that Dr. Forest-Lam signed the certificate of need causing her to be committed and did not personally examine her in violation of Section 33-6-404. In this situation, she asserted, the medical malpractice statutes are inapplicable, and expert testimony regarding a standard of care is unnecessary to prove her case. Therefore, Vickroy argued, summary judgment should not be granted to the defendants based on alleged deficiencies in Dr. Menkes' affidavit.

At the conclusion of the hearing, the trial court granted summary judgment in favor of the Hospital, Foss, and Dr. Forest-Lam. The trial court considered Vickroy's claim as one based on medical malpractice, and consequently held that she was required to submit expert testimony that comported with the requirements of Section 29-26-115 to support her claim. On that premise, the trial court concluded that Dr. Menkes' affidavit was not sufficient in that it did not establish that Dr. Menkes was familiar with the standard of care in Dyersburg, Tennessee or a similar community. Tenn. Code Ann. § 29-26-115(a)(1). Further, the trial court stated that Dr. Menkes' affidavit was silent on the issue of causation and, therefore, failed to establish causation as is required under Section 29-26-115(a)(3). Finding, therefore, that Vickroy failed to produce a competent expert as required by Tennessee Code Annotated Section 29-26-115, the trial court granted summary judgment to the Hospital, Foss, and Dr. Forest-Lam. On October 13, 2003, the trial court entered an order

consistent with its oral ruling. Vickroy now appeals the grant of summary judgment to Dr. Forest-Lam.[4]

On appeal, Vickroy argues that the trial court erred in granting summary judgment to Dr. Forest-Lam based on the inadequacy of Dr. Menkes' affidavit. She argues, as she did in the trial court, that her cause of action is not based on a theory of medical malpractice. Rather, her claim is based on the allegation that Dr. Forest-Lam violated Tennessee Code Annotated Section 33-6-404, and her cause of action, therefore, is based on theories of ordinary negligence, emotional distress, and unlawful restraint of her liberty. Vickroy argues that Dr. Menkes' affidavit is not required to comport with the requirements of Section 29-26-115, because Section 33-6-404 sets the standard of care for an emergency room physician in any locale in Tennessee; therefore, Dr. Menkes was not required to be familiar with the standard of care in Dyersburg, Tennessee.

Our review of the trial court's grant of summary judgment is *de novo* on the record before this Court. **Warren v. Estate of Kirk**, 954 S.W.2d 722, 723 (Tenn. 1997). A motion for summary judgment should be granted when the movant demonstrates that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. Tenn. R. Civ. P. 56.04. The party moving for summary judgment bears the burden of demonstrating that no genuine issue of material fact exists. **Bain v. Wells**, 936 S.W.2d 618, 622 (Tenn. 1997).

At the outset, we note that Vickroy's claim against Dr. Forest-Lam is premised on her interpretation of Tennessee Code Annotated § 33-6-404 regarding the certificate of need, the document required by the State to be executed by a "physician, psychologist or designated professional" for an emergency commitment to a mental institution. Vickroy construes Section 33-6-404 as requiring a physician who personally executes the certificate, here Dr. Forest-Lam, to have first personally performed a physical examination of the patient before signing such a certificate of need, and not permitting him to rely on a physical examination of the patient by another physician. It is undisputed that a physical examination of the patient is required under the statute, and in this case, Vickroy was in fact examined by Dr. Cook, the emergency room physician on duty prior to Dr. Forest-Lam. Dr. Forest-Lam reviewed the results of Dr. Cook's examination of Vickroy prior to signing the certificate of need. Dr. Forest-Lam did not, however, personally examine Vickroy. Thus, as a threshold issue, we must address whether the statute is intended to require that the same physician perform the personal examination and sign the certificate of need.

In this case, we seek to construe the following portion of Section 33-6-404:

. . .(2) the physician, psychologist, or designated professional shall immediately examine the person and decide whether the person is subject to admission to a hospital or treatment resource under Section 33-6-403, and

* * *

---

[4]Vickroy did not appeal the dismissal of any of the other defendants.

> (3)(B) if (i) the person is subject to admission, then (ii) the physician, psychologist, or designated professional shall complete a certificate of need for such emergency diagnosis, evaluation and treatment. . . . Tennessee Code Annotated Section 33-6-404(2) and (3)(B)(i) and (ii).

The use of "the" preceding the phrase "physician, psychologist or designated professional" in both subsections (2) and (3) indicates that the same "physician, psychologist, or designated professional" is expected to examine the person, decide whether the person should be admitted for treatment, and also complete the certificate of need.

Despite this language, Dr. Forest-Lam argues that the purpose of the statute is merely to make certain that *a* medical professional examines the patient prior to an involuntary commitment, that it is not necessary that the *same* medical professional who signs the certificate of need also perform the required examination. In other words, Dr. Forest-Lam argues that the language in the statute is ambiguous or unclear. "When the words of a statute are ambiguous or when it is just not clear what the legislature had in mind, courts may look beyond a statute's text for reliable guides to the statute's meaning." ***Bellsouth Telecommunications, Inc. v. Greer***, 972 S.W.2d 663, 673 (Tenn. 1997). Statutory interpretation may include a review of legislative history and an analysis of the statute's terms in the context of the entire statute. ***Id.***

The title of the Code in which Section 33-6-404 is included, Title 33, was significantly revised in 2000.[5] The audio recordings of the consolidation of Title 33 by the Tennessee Senate and the Tennessee House of Representatives yield little useful information on the legislative intent regarding the issue at bar. However, a review of the other chapters in Title 33 is illuminating regarding the intended construction of Section 33-6-404. Tennessee Code Annotated § 33-4-108,[6] states:

> (a) A certificate of need for commitment for care and treatment of a person with mental illness, serious emotional disturbance, or developmental disability is not valid for any purpose unless it is based on personal observation and examination of the person made by the professional not more than three (3) days prior to the making of the certificate. The certificate shall state the facts and reasoning on which the opinions and conclusion are based.
>
> (b) *The execution of a certificate concerning the mental condition of a person by a professional who has not personally observed and examined the person is a Class E felony.*

---

[5]See 2000 TENN. PUB. ACTS 947.

[6] Tennessee Code Annotated Section 33-6-101 incorporates rules from chapter 4 into chapter 6. The statute reads:

Services to persons with mental illness and serious emotional disturbance are governed generally by this title, including chapters 1-4, 7, 8 and 9. TENN. CODE ANN. § 33-6-101 (2001).

TENN. CODE ANN. § 33-4-108 (emphasis added). Thus, in this statute, the Tennessee legislature criminalized the signing of a certificate of need by a professional who had not personally observed and examined the patient. Clearly the legislative expectation was that the involuntary commitment of a patient must be done by a professional who has examined the patient, and not based only on the statements and observations of others.

A similar statute in Illinois was addressed by the Illinois Supreme Court in *In re Michelle J.*, 808 N.E.2d 987 (Ill. 2004). In *Michelle*,[7] the State of Illinois ("State") involuntarily committed the respondent Sam S. ("Sam"). *Id.* at 989. At a later hearing, the State attempted to extend the commitment under section 3-807[8] of the Illinois Mental Health and Developmental Disabilities Code (the "Code"). *Id.* In the commitment proceedings, the State presented one witness, a psychologist, to testify about Sam's continuing mental illness. *Id.* at 990. The testifying psychologist had not personally examined Sam, but instead relied on the examinations of Sam by another psychologist and a clinical social worker. *Id.* Both the trial court and the intermediate appellate court had upheld Sam's involuntary commitment based on this psychologist's testimony, observing that "a personal interview with the [patient] prior to a hearing for involuntary commitment is 'highly desirous,' but [finding] that such an interview is not absolutely required by the Code where . . . the expert has examined the [patient's] medical records . . ." *Id.* The Illinois Supreme Court reversed, stating that "[e]xamining a person's medical records . . . is not the same as examining the person, which is what the statute specifies." *Id.* at 991-992. It commented:

> If the General Assembly thought that reviewing a respondent's medical charts and interviewing other staff members were an adequate substitute for an actual examination, it could have included such language in the statute. It did not. We cannot rewrite a statute under the guise of statutory construction or depart from the plain language of a statute by reading into it exceptions, limitations, or conditions not expressed by the legislature.

The *Michelle* court went on to note that "[b]ecause involuntary administration of mental health services implicates fundamental liberty interests, statutes governing the applicable procedures should be construed narrowly." *Id*. at 992 (citing *In re Barbara H.*, 702 N.E.2d 555 (Ill. 1998)). We find the reasoning in *Michelle* convincing.

---

[7]*In re Michelle J.* consolidated two unrelated respondents, Michelle and Sam. Although both cases were appealed on the same statutory grounds, the facts relating to Sam's commitment are more relevant to the analysis. The respondents' last names were omitted to protect their privacy.

[8] The relevant statute states:
No respondent may be found subject to involuntary admission unless at least one psychiatrist, clinical social worker, or clinical psychologist who has examined him testifies in person at the hearing. The respondent may waive the requirement of the testimony subject to the approval of the court.

405 ILCS 5/3-807 (West 2000).

Thus, even if the language in Section 33-6-404 is deemed ambiguous, we find that other provisions in the same title, as well as persuasive caselaw, confirm that the correct construction of the statute requires that the medical professional who signs the certificate of need for involuntary commitment must first personally examine the person to be committed.[9] Therefore, Vickroy is correct in her assertion that Section 33-6-404 prohibits a "physician, psychologist, or designated professional" from committing a person without first conducting a personal examination.

Dr. Forest-Lam maintains that, regardless of the strictures of Section 33-6-404, Vickroy's claims against Dr. Forest-Lam must be classified as medical malpractice, subject to the expert proof requirements set forth in Tennessee Code Annotated § 29-26-115. If so, Dr. Forest-Lam contends, Dr. Menkes' affidavit falls well short of the statutory requirements in that it does not state that he is familiar with the applicable standard of care for an emergency physician in Dyersburg or a similar community and also does not state that Dr. Forest-Lam's actions were the proximate cause of Vickroy's injuries.

Vickroy argues that her claim is not a malpractice claim in which the issue is the propriety of the defendant physician's medical judgment. Rather, Vickroy argues that Section 33-6-404 establishes the standard of care and no expert proof is needed to prove that Dr. Forest-Lam did not meet this standard. Therefore, we must ascertain if, and the extent to which, Vickroy's cause of action against Dr. Forest-Lam is a medical malpractice claim subject to the expert proof requirements of Tennessee Code Annotated Section 29-26-115.

In her complaint, Vickroy recounts the events of February 4, 2001. She asserts that Dr. Forest-Lam falsely certified in the certificate of need that he had personally examined Vickroy, and that he made no personal judgment about her condition before causing her to be involuntarily transported to Western without proper cause. She alleges that Dr. Forest-Lam's actions "were negligent and caused serious emotional distress and unlawful restraint on the liberty of" Vickroy. Vickroy sought compensatory and punitive damages for her "physical and emotional distress" and the deprivation of her liberty.

To the extent that Vickroy's claim is based on a theory of medical malpractice, it must fail based on the inadequacy of Dr. Menkes' affidavit. Vickroy argues that, if this case were construed as a medical malpractice action, she need not comply with the requirement of Section 29-26-115 to produce evidence of the standard of care in the community because Section 33-6-404 establishes the statutory standard of care for the entire state. We need not decide that issue, because Menkes' affidavit clearly fails to establish causation in a medical malpractice context.[10] Section 29-26-

---

[9]Obviously, the medical professional who signs the certificate of need can, and most likely must, rely on the statements and observations of others in the medical chart, in addition to his personal examination of the patient.

[10]Particularly in light of Tennessee Code Annotated Section 33-4-108, it is unlikely that the standard of care would permit a physician to sign the certificate of need without having personally examined the person being committed. Dr. Forest-Lam disputes this, citing *Holt ex rel Walker v. City of Memphis*, No. W2000-00913-COA-R3-CV, 2001 WL 846081 (Tenn. Ct. App. July 20, 2001). In *Holt*, the plaintiff alleged that his mother would not

115(a)(3) requires that a plaintiff show by expert testimony that his injuries were the physician's breach of the standard of care was "a proximate result of the defendant's negligent act or omission." TENN. CODE ANN. § 29-26-115(a)(3) (2001). As the trial court noted, "Dr. Menkes' affidavit is completely silent on the issue of causation." Therefore, we must conclude that the trial court did not err in granting Dr. Forest-Lam's motion for summary judgment insofar as Vickroy's cause of action against Dr. Forest-Lam is based on a theory of medical malpractice.

However, Vickory's cause of action against Dr. Forest-Lam is not limited to claims arising out of alleged medical malpractice. As stated above, in the September 30, 2003 hearing on the motions for summary judgment, Vickroy argued that Section 33-6-404 establishes the standard of care and no expert proof is needed to prove that Dr. Forest-Lam did not meet this standard. We agree with the general reasoning of this statement but clarify that the statute establishes a standard of *conduct* for any person qualified to sign a certificate of need for involuntary commitment. "The standard of conduct expected of a reasonable person may be prescribed in a statute and, consequently, a violation of the statute may be deemed to be negligence per se." ***Cook ex rel. Uithoven v. Spinnaker's of Rivergate, Inc.***, 878 S.W.2d 934, 937 (Tenn. 1994) In a negligence per se action, the plaintiff must show that the "statute violated was designed to impose a duty or prohibit and act for the benefit of the public. (citations omitted) It must also be established that the injured party was within the class of persons that the statute was meant to protect." ***Id.*** at 937. Vickroy argues that her damages arise from Dr. Forest-Lam's violation of the commitment statute. Thus, in essence, Vickroy states a claim of negligence per se.

On the portion of Vickroy's claim for deprivation of liberty, the Tennessee case of ***Boaz v. Taylor***, 1986 WL 1154 (Tenn. Ct. App. Jan. 26, 1986), is instructive. In ***Boaz***, plaintiff Anita Boaz ("Boaz") sued defendant W. D. Taylor, M.D. ("Dr. Taylor") for negligent diagnosis and the tort of false imprisonment. ***Id.*** at *1. Dr. Taylor diagnosed Boaz as being severely depressed and suicidal. Based on this diagnosis, Dr. Taylor signed an emergency commitment certificate and had Boaz committed to Northwest Tennessee Mental Health Center. ***Id.*** Boaz alleged that her confinement was unlawful because, although she had been suicidal prior to the commitment, she was not suicidal at

---

have died if paramedics had transported her to the hospital in their first run to the decedent's home. ***Id.*** at *2. A State regulation provided that a patient over age fifty-five with respiratory disease "should be transported" under the destination rules. ***Id.*** at *7. The plaintiff did not present expert testimony on the paramedics' standard of care, but rather relied on the regulation, arguing that it established that the paramedics were required to transport the decedent on the first run, even where she refused such transport. ***Id.*** The Court noted that the regulation did not state that such a patient *must* be transported even if she refuses, and observed that the paramedics' field operations manual outlined alternate procedures when such a patient refuses transport. ***Id.*** The Court found that the defendants' expert testimony was unrefuted that the paramedic cannot force a competent patient in such circumstances to be transported to the hospital, under the applicable standard of care. ***Id.*** at *7. In contrast, in this case, the statute clearly mandates that the physician signing the certificate of need *must* personally examine the person to be involuntarily committed, indeed making it a felony for a physician to sign such a certificate of need without having personally performed such an examination.

-11-

the time of the commitment as required by the statute in effect at the time, Tennessee Code Annotated § 33-603.[11]  *Id.* at *3.

Dr. Taylor filed a motion for summary judgment and provided expert testimony in support of his motions.  *Id.* at *1.  No medical expert testimony was produced by the plaintiff in response.  *Id.* Instead, Boaz attempted to amend her complaint to delete the allegations of medical malpractice, leaving intact the allegations of false imprisonment.  *Id.*  Boaz filed the affidavits of herself and her husband, denying that she was suicidal at the time of the commitment, and relying on Section 33-603. *Id.*  The trial court dismissed the complaint based on Boaz' failure to file expert testimony in support of her claims.  *Id.*  On appeal, in analyzing the claim for false imprisonment, the *Boaz* court stated that a "wrongful commitment against one's will constitutes the tort of false imprisonment." *Id.* at *2. The *Boaz* court observed:

> The Court would be correct in granting a partial summary judgment as to the medical malpractice counts as there were no countervailing medical affidavits filed regarding these counts as would be required to defeat the motion in this case. . . .  As to plaintiff's false imprisonment claim, however, we hold no expert medical affidavits were necessary to avoid summary judgment.  Any lay person can be guilty of the offense.
>
> Since a medical degree is not a prerequisite to be guilty of the offense, medical opinion proof is not necessary to establish the claim and medical opinion proof is not required to refute it.  Ordinary facts will do the job.  Theoretically one could be guilty of medical malpractice and false imprisonment, but, one may proceed on one theory independent of the other.

*Id.*  The court noted that the statute, Section 33-603, provided "that others than doctors may take one into custody.  The criteria for such action is the same under the statute whether the party taking another into custody is a doctor or not." *Id.* at *3.  The *Boaz* court found that it was undisputed that

---

[11]Tennessee Code Annotated Section 33-603 stated:

Persons possessing a likelihood of serious harm - Custody and hospitalization procedures.
(a) Any state, county, or municipal officer authorized to make arrests in Tennessee or any licensed physician who has reason to believe that an individual is mentally ill and, because of this illness, possesses a likelihood of serious harm if he is not immediately detained may, without a warrant, take such individual into custody. The phrase 'likelihood of serious harm, for this section means (1) a substantial risk of physical harm to the person himself as manifested by evidence of threats of, or attempts at, suicide or serious bodily harm; or (2) a substantial risk of physical harm to other persons as manifested by evidence of homicidal or other violent behavior or evidence that others are placed in reasonable fear of violent behavior and serious physical harm to them.

Tennessee Code Annotated Section 33-603 (1977).  This statute is similar to current statutes Tennessee Code Annotated Sections 33-6-402 and 403.

Boaz had told Dr. Taylor that she was thinking of killing her non-existent "twin sister," and held that this would constitute an expression of suicidal intent, justifying Dr. Taylor's actions. *Id.* On this basis, the grant of summary judgment to Dr. Taylor was affirmed. *Id.* at *4.

As in *Boaz*, the statute at issue, Section 33-6-404, authorizes not only a physician, but also a "psychologist or designated professional"[12] to execute a certificate of need committing a person to a mental institution such as Western. As discussed above, a prerequisite is that the person signing the certificate of need must first have examined the person to be committed. This is mandated whether the person signing the certificate of need is a physician or not. Therefore, the claim is not one based on medical malpractice, and expert testimony is not necessary to establish a claim for relief. *Boaz*, 1986 WL 1154 at *2.

In the instant case, Vickroy's complaint alleged that Dr. Forest-Lam committed a wrongful act by committing her to Western without having first personally examined her, as required by Section 33-6-404. In essence, Vickroy alleges that Dr. Forest-Lam signed the certificate of need committing her to Western without legal authority to do so, which we construe as a claim for false imprisonment.[13] *See Baines v. Brady*, 265 P.2d 194, 197 (Cal. 1953) ("Physical inconvenience and mental suffering following upon a false arrest are proper elements of damage. The trier of facts has considerable discretion in determining the amount of damages where the illegal restraint is accompanied by circumstances causing humiliation, shame and public disgrace.")

Although Vickroy did not state a claim for violation of the constitutional requirement of procedural due process, caselaw on such a claim is informative on the issue of damages. *See State of Tenn. V. Phillips*, 968 S.W.2d 874, 879 (Tenn. Crim. App. 1996) ("involuntary commitment to

---

[12]A designated professional is defined in T.C.A. § 33-5-427(b) as:

(b) If a person:
(1) Is a qualified mental health professional under § 33-1-101;
(2) Is licensed or certified to practice in the state if required for the discipline; and
(3) Satisfactorily completes a training program approved and provided by the department on emergency commitment criteria and procedures; the commissioner may designate the person to take any action authorized and perform any duty imposed on a physician by §§ 33-6-401 - 33-6-406 to the extent such duties are within the scope of practice of the profession in which the person is licensed or certified.

T.C.A. § 33-6-427(b) (2001).

[13]T.C.A. § 39-13-302 states:

(a) A person commits the offense of false imprisonment who knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty.

(b) False imprisonment is a Class A misdemeanor.

T.C.A. § 39-13-302 (2003).

a mental institution constitutes a deprivation of liberty that invokes the constitutional protection of procedural due process."). The United States Supreme Court discussed the issue of damages in this context in *Cary v. Piphus*, 98 S.Ct. 1042 (1978). In *Carey*, a public school principal observed what he thought was a student smoking marijuana on campus. *Id.* at 1045-46. The student denied the charge but was nevertheless given a twenty-day suspension based on the allegation of the principal. *Id.* at 1045. The student and his mother filed suit under 42 U.S.C. Section 1983, charging that, by giving the student a lengthy suspension without any adjudicative hearing, the principal had suspended the student without due process of law in violation of the Fourteenth Amendment. The Court stated that a plaintiff may have a cause of action based on emotional distress from the mere denial of the due process itself. *Id.* at 1052. The Court compared this type of damage to damage resulting from the humiliation of discrimination, or that of "humiliation and distress caused by unlawful arrests, searches, and seizures." *Id.* at 1053, n.22.

The intermediate appellate court in *Carey* had held that the student would not be entitled to recover damages for injuries caused by the suspension if it were shown that the student would have been suspended even if a proper hearing had been held, because in that case, the failure to accord procedural due process could not be viewed as the cause of the suspension. *Id.* at 1050. The Supreme Court agreed with this holding. *Id.* The *Carey* Court went on to hold that the student may be entitled to recover damages for the denial of due process itself, even if the suspension proved justified. The Court noted that "a purpose of procedural due process is to convey to the individual a feeling that the government has dealt with him fairly, as well as to minimize the risk of mistaken deprivations of protected interests." *Id.* at 1051. Consequently, the Court held that the student should be given the opportunity to produce evidence of mental and emotional distress caused by the denial of procedural due process itself. *Id.* at 1052.

In this case, Vickroy claims that Dr. Forest-Lam's negligence caused her physical and emotional distress, as well as loss of liberty. As in *Carey*, even if Dr. Forest-Lam would have committed Vickroy had he examined her, she may still be awarded damages arising out of Dr. Forest-Lam's failure to examine her before signing the certificate of need committing her to Western for evaluation.[14] All other issues raised on appeal are pretermitted.

In sum, the trial court's grant of summary judgment in favor of Dr. Forest-Lam is affirmed as to Vickroy's claims of medical malpractice. The grant of summary judgment is reversed as to any remaining claims, including claims of negligence per se and false imprisonment.[15]

---

[14]For example, Vickroy alleges as part of her injuries a "loss of ability to participate in meaningful therapeutic relationship due to mistrust of the psychiatric system, resulting in the inability to obtain proper treatment."

[15]Since the remaining negligence per se and false imprisonment claims against Dr. Forest-Lam are not medical malpractice claims, Tennessee Code Annotated § 29-26-115 would not be applicable to these issues. *See Peete v. Shelby County Health Care Corp.*, 938 S.W.2d 693, 696 (Tenn. Ct. App. 1996).

The decision of the trial court is affirmed in part and reversed in part, as set forth above, and the cause is remanded for further proceedings not inconsistent with this Opinion. Costs of this appeal are assessed against Defendant/Appellee James Forest-Lam, M.D., for which execution may issue if necessary.

_____

HOLLY M. KIRBY, JUDGE