IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
February 10, 2009 Session

## STATE OF TENNESSEE v. RICHARD ANTHONY ARRIOLA

**Appeal from the Criminal Court for Davidson County**
**No. 95-D-2835    Monte Watkins, Judge**

---

**No. M2007-00428-CCA-R3-CD - Filed August 26, 2009**

---

After conducting a bench trial, the trial court found the Defendant, Richard Anthony Arriola, guilty of one count of first degree murder, one count of attempted first degree murder, and two counts of attempted second degree murder.  The trial court sentenced the Defendant to an effective sentence of life imprisonment plus fifteen years.  This Court remanded the case to the trial court for an order clarifying its findings on the insanity defense.  On appeal, the Defendant claims: (1) the trial court erred when it used an improper legal standard for the insanity defense; and (2) the evidence presented at trial proved by clear and convincing evidence that the Defendant was not guilty by reason of insanity.  After a thorough review of the record and the applicable law, we conclude that the trial court applied an improper legal standard for the insanity defense.  Therefore, we reverse the convictions and remand for a new trial.

**Tenn. R. App. 3 Appeal; Judgment of the Criminal Court Reversed and Remanded**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which DAVID H. WELLES and THOMAS T. WOODALL, JJ., joined.

Jeffrey DeVasher and Aimee Solway, Nashville, Tennessee (on appeal); Ross Alderman and J. Michael Engle, Nashville, Tennessee (at trial), for the Appellant, Richard Anthony Arriola.

Robert E. Cooper, Jr., Attorney General and Reporter; Michael E. Moore, Solicitor General; James E. Gaylord, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; Roger Moore, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

### I.  Facts

## A. Trial

In our remand to the trial court for clarification of its findings on the insanity defense, we summarized the relevant facts:

> This case arises from a standoff between the Defendant and the Davidson County Sheriff's Department on September 22, 1995, which resulted in the death of Officer Jerry Newsome. The Defendant was indicted on charges of one count of first degree murder, one count of attempted first degree murder, and two counts of attempted second degree murder. The Defendant waived his right to a jury trial. At his trial, the relevant evidence included: the Defendant was a well-adjusted and active young man as he completed high school. After enrolling in college at the University of Tennessee-Martin, he began exhibiting symptoms of mental illness. According to his mother, Viola Couser, and his brother, John Arriola, the Defendant became reclusive and paranoid. After completing only one trimester, the Defendant left college and moved back home to Nashville. He then traveled around the world, later claiming to have visited Jerusalem and to have joined a religious group in Florida. When the Defendant would "travel," he would leave home for months at a time, taking only a "pack on his back" and not tell his family his plans. The Defendant also enlisted in the Navy (and was discharged after three to four months for an unknown reason) and got married for less than a month. When he was in Nashville, he worked at his step-father's restaurant peeling potatoes. While he was at home, he engaged in peculiar activities like preaching on street corners and on his front porch when no one was near him to listen. He always carried a Bible with him, and he repeatedly tried to baptize his family. The Defendant was even arrested once for preaching outside in the rain.

> According to Couser, the Defendant was first hospitalized for mental health treatment in 1987. He remained at Middle Tennessee Mental Health Institute (MTMHI) for thirty days, where the doctors diagnosed him with paranoid schizophrenia. The Defendant was released with orders to stay on his medicine and continue treatment, but he did neither. The Defendant was hospitalized at MTMHI for another thirty days in 1988, where he was treated again for paranoid schizophrenia. Similar to before, upon release, he refused to take his medication. Around 1989 or 1990, the Defendant moved from the upstairs of his parents' house into their basement, which he kept "cluttered up," according to his mother. The Defendant was hospitalized a third time in 1991 at Baptist Hospital as a result of judicial order. The Defendant had gotten into a fist fight with his older brother, John, over the issue of the Defendant not bathing regularly. John agreed to drop the charges if the Defendant entered an inpatient treatment facility. He was kept for thirty days, treated for paranoid schizophrenia, and released. According to Couser, after the Defendant was released, he stopped his treatment; when describing one manifestation of her son's illness when he stopped his medication, she said, he

2

"wasn't keeping himself clean. He grew the beard and he wasn't getting his hair cut."

In September 1995, the Defendant began posting signs for his "businesses" in his neighborhood. The Defendant thought he ran a scuba diving business, an electrician business, and an advertising business. When the police served his parents with a warrant, ordering that the signs be removed or they pay a fine, the Defendant threatened the police with his neighbor's dogs. The Defendant's parents took down his signs to avoid paying a fine, but the Defendant replaced the signs and refused to remove them. The Defendant's parents both thought if they served the Defendant with an eviction warrant, the judge could commit the Defendant for treatment or, at least, have the Defendant agree to treatment, similar to what happened in 1991.

On September 22, 1995, Officer Johnnie Spears and Officer Jerry Newsome arrived at the Defendant's house to serve him with the eviction warrant. Officer Spears wore his badge in a visible location, and Officer Newsome wore a green and tan Sheriff's Department uniform. They knocked on the door with their night sticks, to avoid another threat involving the neighbor's dogs. The Defendant "came out sideways with his hand behind his back. . . . He was cussing." Officer Spears said he dropped the warrant on the ground, and as he started to turn, "that's when [the Defendant] shot me in the mid-section, and it knocked me down." Officer Spears also saw Officer Newsome "grab his chest and fall." Officer Spears said the Defendant was originally firing a handgun, but as he made his way back to his police cruiser to call for help, the Defendant began using a camouflaged shotgun. Officer Spears thought Officer Newsome was dead because he never saw him move after falling. Officer Spears made a radio call signaling that a "police officer [was] in serious danger."

Officer Mike Hagar arrived at the scene after hearing the radio call. He saw Officer Newsome lying in the grass and not moving. After additional police arrived, they realized the Defendant was still in the basement, and they called for the SWAT team. Officer Hagar stated that the Defendant's brother, John Arriola, came to the scene and warned them that the Defendant was schizophrenic. Officer Hagar said that, while he was at the scene, no shots were fired before the SWAT team went into the house.

When the SWAT team arrived, they divided up into two teams: one for the upstairs portion of the house and one for the basement portion of the house. They initially tried negotiating with the Defendant, but there was no response. After the negotiation failed, the SWAT team began to move into the house. Before the basement team made it into the house, they began "drawing fire" from the Defendant after throwing two "distraction devices" into the house. Distraction devices are stun grenades that "cause[] a concussion. . . . And if [a person is] looking at it the flash

3

will temporarily blind them." After throwing in the second device, the SWAT team heard gun shots. According to Officer Randy Hickman, one of the SWAT team members on the "upstairs" team, "once we dropped the devices, [the Defendant] fire[d] two, approximately two shots, at us, up the staircase there. Then we g[a]ve commands to come out, and at which time he fired about, approximately, two more shots at us, up the steps. I could see the rounds ricochet."

As the SWAT team was "thinking of what [it was] going to do next, that's when the suspect came out" of the house. Officer Hyde said the basement was "filled with smoke," and, as the Defendant came out cursing, one SWAT team member kicked the Defendant's lower body to knock him on the ground. At that point, the Defendant tried grabbing the officer's weapon, but only managed to grab the strap. Eventually, the Defendant was arrested and put into a van for transport to the hospital to check on his injuries.

Officer Pat Postiglione, an officer on the murder squad, helped transport the Defendant to the hospital. He described the Defendant as "very subdued" and said the Defendant refused to give a statement because "he didn't trust the government." Officer Larry Flair, another officer of the murder squad, characterized the Defendant as "coherent, conscious." In fact, the Defendant chose not to waive his *Miranda* rights when they were given to him, and he refused to give consent to search his property. Once the Defendant was out of the basement, various officers of the murder squad searched the basement for weapons. Officer Bill Pridemore described the basement as "very disarrayed. Things [were] scattered throughout the floor." The officers found a handgun in a hole in the drywall.

Doctor Bruce Levy, the current medical examiner for Nashville and a specialist in forensic pathology, testified that Officer Jerry Newsome was shot five times: three times with a handgun and two times with a shotgun. Three of the shots were quickly fatal.

Since the arrest, the Defendant has been housed at MTMHI and undergoing therapy and treatment for paranoid schizophrenia. Some of the Defendant's delusions included that his mother did not give birth to him; rather, he believed she found him at an airport. The Defendant also had a fascination with religion, and he believed he needed to baptize his family members in his bathtub. Dr. Rokeya Farooque, one of the Defendant's doctors at MTMHI, testified that the Defendant "[believed] that he would be the next Pope. He owned the government world bank. He owned the government of the United States." Additionally, he believed he invented the bar code. Dr. Farooque discussed the Defendant's "gradual deteriorating function" at great length. She said he was diagnosed again with paranoid schizophrenia in 1996, which took into account his bizarre behaviors, religious ideas, loose speech, hallucinations, delusional thinking, grandiose

4

delusional thinking, and persecutorial delusional thinking. Dr. Farooque testified that on September 22, 1995, the Defendant was psychotic and was not able to appreciate the wrongfulness of his actions. In fact, she said he felt justified to defend himself because he thought he owned everything.

The Defendant was also treated by Dr. Samuel Craddock, who echoed Dr. Farooque's opinion that the Defendant could not appreciate the wrongfulness of his actions. Dr. Craddock described the Defendant as "suspicious of just about everybody that he encountered." He also stated that the Defendant believed he owned Palm Beach, Florida. Speaking of the September 1995 shooting incident, Dr. Craddock said, "I think even if [the Defendant] were a spectator, though, across the street watching what was occurring, I am not so sure that he could comprehend even what was going on he was so mentally ill, much less being able to participate and having the emotional involvement." Whenever the Defendant was asked about the shooting incident, he complained of "burning sensations." He also suffered from those sensations when the doctors suggested that he take some psychological tests. Moreover, Dr. Craddock conveyed that the Defendant told him that he would not have done anything illegal, implying that he did not know his shooting the police was illegal.

Dr. Patricia Corry explained that the Defendant had two "plans" as part of his mental illness. "Plan A" included all of his purely delusional thoughts, such as, he was going to become King Richard. "Plan B" included his thoughts and memories concerning the September 22, 1995, shooting. When talking about the shooting, the Defendant only recalls "intruding thoughts that - really voices, or feelings, or things that - he thought he could float around outside his body, things that he could feel inside his body as well." The Defendant told Dr. Corry that he heard "voices that told him to shoot and kill anybody that messed with him." Dr. Corry said the Defendant thought the ship the Queen Mary II was on its way to Florida to take him and Vanessa Corona, one of the characters the Defendant created in his mind, to the Vatican. He believed that Corona was the District Attorney in Miami, Florida and that she would leave the United States with him when he became King Richard, the President of the United States, or the first American Jewish Pope. While in treatment, the Defendant planned which eighty-five countries he was going to conquer and rule when he became king. The Defendant consistently believed himself to be either a saint or a preacher. Dr. Corry also elaborated that the Defendant believed one of the deputies had a virus that "was just kind of free-flow" and it could move from computers to humans in the Defendant's thoughts. The Defendant was afraid of contracting this virus when the police came to his door. Additionally, the Defendant believed the CIA met in a church on West End Avenue in Nashville, Tennessee two months prior to the shooting.

The Defendant was in custody from 1995 until 2006 before he was deemed

competent to stand trial. Dr. Ronnie Stout, another of the Defendant's doctors at MTMHI, said that the Defendant's treatment progress was very slow, partially due to the difficulty of ascertaining the proper medication for him.

After hearing this testimony, the trial court found the Defendant guilty of first degree murder, attempted first degree murder, and two counts of attempted second degree murder. It sentenced the Defendant to an effective sentence of life imprisonment plus fifteen years.

*State v. Richard Anthony Arriola*, No. M2007-00428-CCA-R3-CD, 2008 WL 1991098, at *1-4 (Tenn. Crim. App., at Nashville, May 8, 2008) (herein *Arriola I*) (footnotes omitted), *no Tenn. R. App. P. 11 application filed*.

The Defendant appealed his convictions to this Court claiming that: (1) the trial court used an improper legal standard for the insanity defense because the court required the Defendant to prove that he was unable to appreciate both the wrongfulness of his actions and the nature of his actions; and (2) the trial court wrongly sentenced him to consecutive sentences. On appeal, this Court remanded the case to the trial court with instructions to issue an order clarifying its previous findings. *Id.* at *8. This Court also affirmed the Defendant's sentences. *Id.* The trial court has since issued a supplemental order setting out its findings with respect to the Defendant's insanity defense. It is from this order that the Defendant now appeals.

## II. Analysis

On appeal, the Defendant contends that: (1) the trial court erred when it used an improper legal standard for the insanity defense; and (2) the evidence presented at trial clearly and convincingly supported an insanity defense.

### A. Insanity Defense Legal Standard

The Defendant claims that the trial court applied the wrong legal standard for the insanity defense because the trial court understood the Defendant's ability to appreciate the nature of his actions to encompass his ability to appreciate the wrongfulness of his actions, and, accordingly, required the Defendant to prove he appreciated neither the nature nor the wrongfulness of his actions. The State argues that the trial court did not err because, although it stated that "wrongfulness is part and parcel of the word nature," the trial court later "look[ed] further at the specific facts to discern whether the [D]efendant could appreciate the wrongfulness of his actions."

We discussed the statutorily-based insanity standard in *Arriola I*, and we concluded that for a defendant to successfully prove an insanity defense, he need only prove that, as a result of a severe mental disease or defect, *either* he did not appreciate the nature of his actions *or* he did not appreciate that his actions were wrongful:

6

The statutory requirements for an insanity defense are described in Tennessee Code Annotated section 39-11-501:

> It is an affirmative defense to prosecution that, at the time of the commission of the acts constituting the offense, the defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature *or* wrongfulness of the defendant's acts. Mental disease or defect does not otherwise constitute a defense. The defendant has the burden of proving the defense of insanity by clear and convincing evidence.

(emphasis added) (1995). When interpreting a statute, courts should use the "natural and ordinary meaning[s of the statutory language], unless the legislature used [the words] in a specialized, technical sense." *BellSouth Telecomm., Inc. v. Green*, 972 S.W.2d 663, 673 (Tenn. App. 1997). The word at issue here is "or." There is no indication that the legislature used it in a specialized, technical way, therefore, we will assign it its natural and ordinary meaning. According to *Black's Law Dictionary*, "or" is "a disjunctive particle used to express an alternative or to give a choice of one among two or more things." *Black's Law Dictionary* 1095 (6th ed. 1990). We contrast that with the definition of "and," which is "a conjunction connecting words or phrases expressing the idea that the latter is to be added to or taken along with the first." *Black's Law Dictionary* 86 (6th ed. 1990). Applying the correct definition of "or" to this statute, the plain meaning shows two distinct ways that the defendant may present a successful insanity defense: proving either that he could not appreciate the nature of his acts or, in the alternative, that he could not appreciate the wrongfulness of his acts. Moreover, to prevail, the Defendant need not prove both that he could not appreciate the nature of his act and that he could not appreciate the wrongfulness of his acts.

*Arriola I*, 2008 WL 1991098, at *5. In *Arriola I*, we remanded the case to the trial court and instructed it to clarify its factual findings with respect to the Defendant's insanity defense. *Id.* at *8.

Complying with our request, the trial court issued a written order clarifying its findings on the issue of insanity. It concluded that the concept of "wrongfulness" is a narrower part of the concept of "nature:"

> As the [c]ourt stated in its original ruling, the experts testified that the defendant could not appreciate the wrongfulness of his actions. However, they could not say that the defendant could not appreciate the nature of his actions.

> The [c]ourt believes that *because the defendant could not prove that he was unable to appreciate the nature of his actions he therefore could not prove that he was unable to appreciate the wrongfulness of his actions*. Although the words

7

"nature" and "wrongfulness" are distinctly different words, *"wrongfulness" is encompassed in the word "nature."* The plain meaning of the word "nature" is that "it is the essential character of something." Since terms such as "rightfulness" and "wrongfulness" speak to the essence of character, it follows that *wrongfulness is part and parcel of the word nature, and is simply more narrowly defined than the word nature.* The [c]ourt thus had to look further at the specific facts to discern whether the defendant could appreciate the wrongfulness of his actions.

(emphasis added). The trial court then listed facts from the case that, in its view, demonstrated the Defendant knew his actions were wrong:

Initially, when the defendant was contacted by the deputies, he hid his weapon behind his back, thus indicating not only his intent but his knowledge of the wrongfulness of his action. After the defendant shot and wounded one deputy and killed another deputy, he demonstrated that he knew that it was wrong by barricading himself in his apartment and refusing to come out even after being surrounded by the police. He had to be forced out through the use of distraction devices. The defendant further demonstrated the wrongfulness of his actions by hiding his pistol. If he truly believed that he owned the world and could do no wrong, he would not have attempted to hide himself or one of his weapons. Moreover, the defendant refused to discuss with the police or his treatment providers the acts that he committed that day, again implying that he knew that his actions were wrong. It was not until sometime later that he began to discuss the events of that day with his treatment providers.

After that discussion, the trial court concluded that "the defendant did not carry his burden of proving by clear and convincing evidence that he was unable to appreciate the nature or wrongfulness of his acts."

Whether the trial court used the proper legal standard for the insanity defense is a question of law, which we review *de novo* with no presumption of correctness. We conclude that the trial court applied the wrong legal standard. First, the trial court clearly stated that the concept of "wrongfulness" is encompassed in the concept of "nature." We respectfully disagree. "Wrongfulness" goes to whether a defendant understands whether the actions were wrong, or, in other words, it addresses a moral capacity, whereas "nature" goes to whether a defendant understands what the actions were, or, in other words, it addresses a cognitive capacity. *See Clark v. Arizona*, 548 U.S. 735, 747-48, 753-54 (2006) (interpreting Arizona's insanity defense statute,[1] which has similar language to Tennessee's statute)); *see also State v. Holder*, 15 S.W.3d 905 (Tenn. Crim. App. 1999) (holding that the defendant knew the nature of his actions because he knew he stabbed a man

[1] The relevant portion of the Arizona insanity defense statute reads that a "person was suffering from such a mental disease or defect as not to know the nature and quality of the act or, if such person did know, that such person did not know that what he was doing was wrong." Ariz. Rev. Stat. Ann. § 13-502 (West 1978).

and that he knew the wrongfulness of those actions because he knew stabbing a person was wrong). Additionally, as we stated in *Arriola I*, the Legislature listed "wrongfulness" and "nature" as independent grounds of supporting a defense of insanity. *See* T.C.A. § 39-11-501 (1995). Thus, the two words must be mutually exclusive and not "part and parcel," as the trial court found.

Second, a defendant need only successfully prove that he, "as a result of a severe mental disease or defect, was unable to appreciate the nature *or* wrongfulness of [his] acts." T.C.A. § 39-11-501. The trial court wrote that "*because* the defendant could not prove that he was unable to appreciate the *nature* of his actions he *therefore* could not prove that he was unable to appreciate the *wrongfulness* of his actions." (emphasis added.) Again, we respectfully disagree. A defendant need only prove that, as a result of a severe mental disease or defect, *either* he could not appreciate the nature of his actions *or* he could not appreciate the wrongfulness of those actions. T.C.A. § 39-11-501. In addition to the discussion we have already presented from *Arriola I*, we add that the nature or wrongfulness language of the Tennessee insanity defense statute corresponds to a portion of the *M'Naghten* standard, a well-known insanity defense rule.[2] *Arriola I*, 2008 WL 1991098, at * 5; 8 Eng. Rep. 718. *M'Naughten* reads, in relevant part, that the defendant "was labouring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing; or, if he did know it, that he did not know he was doing what was wrong." 8 Eng. Rep. 718. In *Graham v. State*, the Tennessee Supreme Court analyzed that particular language of the *M'Naghten* insanity standard, and it parsed out the requirements of the two-prong test:

> There are two *M'Naghten* tests: (1) knowledge of the nature and quality of the act and (2) knowledge of its wrongfulness. These criteria are expressed in the conjunctive in that it must be shown that the defendant knew right from wrong and knew the nature and quality of the act, in order to convict of a crime while laboring under a defect of reason or disease of the mind. If a defendant does not know the nature and quality of the act he is insane; if he knows this but does not know right from wrong, he is insane.
>
> The failure to recognize and apply both prongs of this two-prong test operates to narrow the rules.

*Graham v. State*, 547 S.W.2d 531, 539 (Tenn. 1977). In other words, if a defendant proves by clear and convincing evidence either prong (that he cannot appreciate the nature of his acts or that he cannot appreciate the wrongfulness of his acts), he has met the burden of the insanity defense. Given the marked similarities between the *M'Naughten* standard and the current Tennessee insanity defense statute, we see no reason not to impute the Tennessee Supreme Court's previous conclusion to the

---

[2] The Tennessee insanity defense statute was formally adopted from the Federal Insanity Defense Act of 1984, and the same nature and wrongfulness language is in both the Federal insanity statute and the Tennessee insanity statute. *See State v. Flake*, 88 S.W.3d 540, 550-51 (Tenn. 2002); *see also* 18 U.S.C. § 17. That same nature and wrongfulness language is also found in *M'Naughten*, and while there are obvious differences between the Tennessee statute and the *M'Naughten* standard, such as who bears the burden of proof, we look only to the similar clauses between them which discuss the nature and wrongfulness of a defendant's actions. *See* 8 Eng. Rep. 718.

current statute. As such, there are two separate prongs of the Tennessee insanity defense: whether the defendant understood the nature of his actions or whether he understood the wrongfulness of his actions. And, a defendant need only prove one prong to be successful in his defense. Thus, the trial court erred in the legal standard it applied, and we must turn to address whether, applying the correct legal standard, the evidence was sufficient to prove the insanity defense.

## B. Remedy

The Defendant argues that he has proven by clear and convincing evidence that, as a result of a severe mental disease, he was unable to appreciate the wrongfulness of his conduct. The Defendant asks this Court to rely on the trial court's factual findings but to apply the correct legal standard to those findings. The State argues that this Court must rely on the trial court's factual findings and that these findings, taken in the light most favorable to the State, do not sufficiently support the Defendant's insanity defense.

After a careful consideration, we conclude that we cannot grant the relief sought by either side, rather, we must remand this case for a new trial. Although this case was a bench trial, we conclude that the appropriate remedy to be the same as for a jury trial. Generally, a jury would resolve all factual issues and apply the appropriate legal principles, as instructed by the trial court. Similarly, if in a bench trial, the trial court merely issued a finding of guilt, all factual findings would be based on that determination. This case is not that simple. In this case, the trial court, acting as the finder of fact, twice explained his factual findings and conclusions of law with respect to the Defendant's insanity defense. Because he enunciated these findings, this Court may not ignore them. *See generally State v. Hood*, 868 S.W.2d 744 (Tenn. Crim. App. 1993).

In our view, the trial court's application, in this bench trial, of an erroneous legal standard for insanity should be analyzed just as we would analyze a jury trial in which the jury was given this erroneous legal standard for determining the applicability of the insanity defense. We conclude that this error affected the verdict, was not harmless, and prevented the Defendant from receiving a fair trial. *See State v. Hodges*, 944 S.W.2d 346, 352 (Tenn. 1997). Generally, "a defendant has a constitutional right to a correct and complete charge of the law." *State v. Teel*, 793 S.W.2d 236, 249 (Tenn. 1990), *superceded by statute on other grounds as stated in State v. Reid*, 91 S.W.3d 247 (Tenn. 2002). Because the Defendant's conviction is based on the trial court's application of an erroneous legal standard, the Defendant did not receive a fair trial. *See Hodges*, 944 S.W.2d at 352 ("A jury instruction is considered "prejudicially erroneous," only "if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law."). Considering the Defendant's constitutional right to a fair trial, we remand this case for a new trial.

The Defendant argues that he proved by clear and convincing evidence that he is entitled to a verdict of "not guilty by reason of insanity" and that this Court should modify the trial court's judgment to that effect. We respectfully decline to do so. To a large extent, whether the Defendant met his burden of proof as to the insanity defense depends upon the credibility of the Defendant's expert witnesses. Because we are a reviewing court, without, in most situations, the means of

10

assessing the credibility of witnesses, we have concluded that a new trial is the appropriate remedy in this case. Because a new trial dictates the utilization of a new finder of facts, we also conclude that the interests of justice require that a different trial judge be assigned this case upon remand.

In sum, we conclude the Defendant did not receive a fair trial, and the proper remedy is to order a new trial.

### III. Conclusion

This Court is of the opinion that the trial court applied an incorrect legal standard of insanity to this case. After a careful review of the record and the applicable law, we reverse the judgments of the trial court and remand this case for a new trial. We further order that this case be transferred from Division V of the Davidson County Criminal Court to another Division of the Davidson County Criminal Court for further proceedings.

_____
ROBERT W. WEDEMEYER, JUDGE